UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
*Electronically filed*

**COMMONWEALTH OF KENTUCKY**;

**STATE OF SOUTH DAKOTA;**

**STATE OF ALABAMA;**

**STATE OF ALASKA;**

**STATE OF ARKANSAS;**

**STATE OF FLORIDA;**

**STATE OF IDAHO;**

**STATE OF INDIANA;**

**STATE OF IOWA;**

**STATE OF KANSAS;**

**STATE OF MISSISSIPPI;**

**STATE OF MONTANA;**

**STATE OF NEBRASKA;**

**STATE OF NORTH DAKOTA;**

**STATE OF OHIO;**

**STATE OF OKLAHOMA**

**STATE OF SOUTH CAROLINA;**

**STATE OF UTAH;**

**COMMONWEALTH OF VIRGINIA;**

**STATE OF WEST VIRGINIA; and**

Civil Action No. 5:23-cv-162-BJB

**STATE OF WYOMING**

    *Plaintiffs*

v.

**FEDERAL HIGHWAY ADMINISTRATION;**

**SHAILEN BHATT** in his official capacity at Administrator of the Federal Highway Administration;

**U.S. DEPARTMENT OF TRANSPORTATION**;

**PETE BUTTIGIEG** in his official capacity as Secretary of Transportation;

**JOSEPH R. BIDEN** in his official capacity as President of the United States

    *Defendants*

---

## COMPLAINT

With one of his first executive orders, President Biden announced that it would be "the policy of [his] Administration . . . to reduce greenhouse gas emissions." Exec. Order No. 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, at section 1 (Jan. 20, 2021). Accordingly, he directed all executive departments and agencies to review existing regulations and consider revising them in order to further that policy. *Id.* In line with that direction, the Federal Highway Administration ("FHWA") and the U.S. Department of Transportation ("U.S. DOT") (collectively, "the Agencies") promulgated a rule

2

requiring all States with National Highway System mileage to take affirmative steps to set declining targets to reduce on-road $CO_2$ emissions.

The rule, *National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure*, 88 Fed. Reg. 85364 (December 7, 2023) (hereinafter "Final Rule") [Exhibit 1], certainly follows President Biden's policy wishes, but the Agencies simply do not have authority to issue it. Congress has not given FHWA or U.S. DOT authority to regulate greenhouse gas emissions ("GHG"). Nor can the Agencies compel the States to administer a federal regulatory program or mandate them to further Executive policy wishes absent some other authority to do so—which is lacking as to this rule. Furthermore, the Final Rule is arbitrary and capricious. The Plaintiffs, Kentucky, South Dakota, Alabama, Alaska, Arkansas, Florida, Idaho, Indiana, Iowa, Kansas, Mississippi, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, Utah, Virginia, West Virginia, and Wyoming, by and through their Attorneys General, seek judicial relief from this unlawful and unconstitutional rule.

## PARTIES

Plaintiffs

1.     The Commonwealth of Kentucky is a sovereign State of the United States of America. The Commonwealth sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

2.     The Attorney General of the Commonwealth of Kentucky is authorized to bring legal actions on behalf of the Commonwealth and its citizens. Ky. Rev. Stat.

§ 15.020. The Attorney General is "charged with the duty of protecting the interest of all the people," *Hancock v. Terry Elkhorn Mining Co.*, 503 S.W.2d 710, 715 (Ky. 1973), including by ensuring that government actors perform their duties lawfully, *see Commonwealth ex rel. Beshear v. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016); *see also Cameron v. EMW Women's Surgical Ctr., PSC,* 595 U.S. 267, 278 (2022) (recognizing that the Attorney General is "deemed Kentucky's 'chief law officer' with the authority to represent the Commonwealth 'in all cases'").

3.      Within the Commonwealth of Kentucky, there are over 4,000 center-line miles of National Highway System.[1] And, as demonstrated by the recent expansion of the four-lane section of U.S. Highway 641 from Murray to Hazel on the Kentucky-Tennessee line—completing "Kentucky's section of a corridor from Interstate Highway 69 at Benton to Paris, Tennessee, and Interstate Highway 40 to the south"—the National Highway System within the Commonwealth continues to grow.[2] Similarly, the current state road plan designates the I-69 Ohio River Crossing Project as a "mega project."[3] These projects, and similar expansions, will certainly result in additional vehicular traffic and thus, $CO_2$ emissions.

---

[1]     *Estimated MAP-21 NHS Mileages*, U.S. DEPARTMENT OF TRANSPORTATION FEDERAL HIGHWAY ADMINISTRATION,
https://www.fhwa.dot.gov/planning/national_highway_system/nhs_maps/map21estmileage.cfm (last visited Nov. 27, 2023) [hereinafter U.S. DOT Estimate NHS Mileages].

[2]     Crystal Staley, *Gov. Beshear Joins Local Leaders to Cut Ribbon on New U.S. Highway 641 in Southern Calloway County,* OFFICE OF THE GOVERNOR (Oct. 12, 2023), https://www.kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=1979.

[3]     *Kentucky's 2022-2028 Enacted Highway Plan*, KENTUCKY TRANSPORTATION CABINET at 13 (Jun. 2022), *available at* https://transportation.ky.gov/Program-Management/2022%20Enacted%20Highway%20Plan/2022%20Enacted%20Highway%20Plan%20Combined%20Book%20June%2028%202022.pdf.

4.      South Dakota is a sovereign State of the United States. It sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests, as well as its rights and prerogatives as a State under Federal highway statutes.

5.      The State of South Dakota is a large State with long stretches of Interstate and National Highway System miles that help connect the nation and the people and businesses of South Dakota to the nation and world.  A modern highway system in good or better condition supports the economy of the State and the quality of life of its residents. The improvement and preservation of the highway system in South Dakota is supported in significant part by the South Dakota Department of Transportation ("SDDOT") which, like other state DOTs, receives apportioned and other funds from Defendant Federal Highway Administration. Receipt of those funds subjects SDDOT to various regulations, including by defendant Agencies. SDDOT proudly undertakes its work in compliance with Federal requirements and strives to make effective decisions on the investment of highway funds (for projects large and small) to provide maximum benefit to the State, enhancing the economy and the quality of life while complying with environmental requirements. However, some highway investments, and straightforward economic growth, can result in additional $CO_2$ emissions. The State seeks the ability to continue to make decisions to maximize the benefits of its highway investments by avoiding the harm of being subject to unlawful regulation via the Final Rule, which, among other things, would impose costs and restrict or burden the State's choices in implementing its Federally-assisted highway program.

6.     Alabama is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

7.     The Attorney General of Alabama is authorized to bring legal actions on behalf of Alabama and its citizens. Ala. Code §§ 36-15-1, 36-15-12. The Attorney General is the "chief law officer of the state" and maintains "direction and control" over "[e]ssentially all litigation concerning the interest of the state." *Chapman v. Gooden*, 974 So. 2d 972, 988 (Ala. 2007) (quoting *Ex parte Weaver*, 570 So.2d 675, 679-80 (Ala.1990)) (emphasis and quotation marks omitted).

8.     Within Alabama, there are over 4,000 center-line miles of National Highway System.[4] The Governor of Alabama recently announced "three major interstate projects" including the widening of I-65 and I-59.[5] These projects, and similar expansions, will certainly result in additional vehicular traffic and thus, $CO_2$ emissions.

9.     Alaska is a sovereign State of the United States. It sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests, as well as its rights and prerogatives as a State under Federal highway statutes.

10.     The Attorney General of Alaska represents the State of Alaska in all actions in which Alaska is a party. Alaska Statutes 44.23.020(b)(3); *Standard Alaska Production Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989). The Alaska Attorney

---

[4]     U.S. DOT Estimate NHS Mileages, *supra* note 1.
[5]     *Governor Ivey Announces Widening of I-65, Hoover Interchange Project and Widening of I-59*, ALA. THE OFFICE OF ALABAMA GOVERNOR KAY IVEY (AUG. 31, 2023), https://governor.alabama.gov/newsroom/2023/08/governor-ivey-announces-widening-of-i-65-hoover-interchange-project-and-widening-of-i-59/.

General is also required to review federal statutes, regulations, and executive orders that may preempt state law or that were not properly adopted in accordance with federal statutory authority. Alaska Statutes 44.23.020(h).

11.     Alaska has 6,181 center-line miles of paved public roads, with the vast majority of those operated and maintained by the Alaska Department of Transportation and Public Facilities ("DOT&PF"). Included in DOT&PF's road inventory is 2,228 center-line miles of the National Highway System,[6] which connect Alaska's urban areas to each other and to the Arctic oil fields. Additionally, the DOT&PF provides ferry services to 30 communities stretched along 3,500 miles of coastline through its Alaska Marine Highway System.[7] To preserve and expand this network of highways DOT&PF receives congressionally apportioned and other federal funding through the defendant Federal Highway Administration. The public's use of these preserved and expanded highway systems, through normal demographic and economic growth, could result in additional $CO_2$ emissions. The State of Alaska and DOT&PF seek to accommodate normal demographic and economic growth without threat of enforcement of FHWA's unlawful regulation, which would impose costs upon the State and burden the State's enhancement and preservation of its highway system.

12.     The State of Arkansas is a sovereign State of the United States of America. The State sues to vindicate its sovereign, quasi-sovereign, proprietary, and

---

[6]     U.S. DOT Estimate NHS Mileages, *supra* note 1.

[7]     *Alaska Marine Highway System route descriptions,* https://dot.alaska.gov/amhs/route.shtml (last visited Dec. 18, 2023).

*parens patriae* interests. The Attorney General of Arkansas has authority to sue on behalf of the State, Ark. Code Ann. § 25-16-703, and believes Arkansas will be harmed by the Final Rule, and therefore joins.

13.     Florida is a sovereign State of the United States. It sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests, as well as its rights and prerogatives as a State under Federal highway statutes.

14.     Within Florida, there are over 12,000 miles of National Highway System. In recent years, Florida has experienced a major increase in its population, which currently sits at close to 22 million residents. Florida has also welcomed upwards of 137 million tourists to the State in 2023 alone. Both the population and number of visitors to the State are projected to continue to increase, likely increasing vehicle traffic in the State.

15.     Florida is a fuel-diverse state and relies on several options to ensure its economic success and a high quality of life for both residents and visitors alike. For example, Florida produces a wide variety of agriculture products that must be trucked and shipped via traditional methods; has a top-15 global economy for imports and exports through its world-renowned seaports; utilizes compressed natural gas for school buses and local transit assets; and relies on traditional fuel sources to support recovery efforts after natural disasters such as hurricanes.

16.     The Final Rule requires the Florida Department of Transportation ("FDOT") to track emissions, set declining targets for emissions that the State must try to reach, and to report on the same. FDOT does not currently track the data or

prepare the types of reports that are now required by the Final Rule. In addition to FDOT's responsibility to track these requirements, the 27 MPOs across the State and the respective joint targets required by the Rule bring the total targets across the State to over 70—a clear burden and economic hardship on Florida's local partners. The effort to comply with the Rule will have a vast, direct impact on the lives of Floridians and Florida's economy.

17.     The State of Idaho is a sovereign State of the United States of America. The State sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests. The Attorney General of Idaho has authority to sue on behalf of the State, Idaho Code 67-1401, and believes Idaho will be harmed by the Final Rule, and therefore joins.

18.     Idaho is a rural State with 2,561 centerline miles on the NHS, and over 56,000 public road (centerline) miles. Idaho's population is rapidly increasing from 1.57 million in 2010 to 1.84 million in 2020, for a total rate of growth rate of 17.3 percent. Idaho maintains an inland seaport in Lewiston, Idaho that shipped over 772,000 bushels of wheat and barley and 185,000 tons of cargo in 2020. Idaho trucks moved over 195,000 kilotons of freight and drove over 26.62 million ton-miles in 2020. Idaho exported over $3.4 billion dollars of commodities to over 165 global partners in 2020. The top three commodities by value are semiconductors and industrial items, food and agriculture items and mining products. Given Idaho's proximity to Canada, a large portion of trade flows between the two countries via Idaho ports of entry. Trade with Canada ($1.1 billion) dominated international movements in 2020.

9

Idaho's other top trade global partners are Taiwan, Singapore and Mexico, valued at nearly $1 billion in 2020.

19.     There are seven MPOs in Idaho: Kootenai, Lewis and Clark Valley, Community Planning Association of Southwest Idaho (representing two MPOs), Magic Valley, Bannock, and Bonneville. The Idaho Transportation Department has over 700 projects scheduled or already under construction with a combined value of $3.4 billion, many of which will expand and improve sections of the National Highway System. Idaho continues to invest in expanding and improving its highways to improve safety, enhance mobility, and promote economic growth and development. These and other projects will certainly result in additional vehicular traffic and thus, $CO_2$ emissions.

20.     The State of Idaho is a large State with long stretches of Interstate and National Highway System miles that help connect the nation and the people and businesses of Idaho to the nation and world.  A modern highway system in good or better condition supports the economy of the State and the quality of life of its residents. The improvement and preservation of the highway system in Idaho is supported in significant part by the Idaho Transportation Department ("ITD") which, like other state DOTs, receives apportioned and other funds from Defendant Federal Highway Administration.

21.     Idaho, like other State DOTs, receives funding from the Federal Highway Administration which subjects ITD to numerous regulations, including the Final Rule challenged in this lawsuit. As a relatively rural State with many

industries that utilize heavy equipment, and which frequently experiences severe winter conditions amidst mountainous terrain, the Final Rule's unlawful mandate to reduce vehicular $CO_2$ emissions will negatively impact the State's economy and the well-being of its residents. The State seeks the ability to continue to make decisions to maximize the benefits of its highway investments by avoiding the harm of being subject to unlawful regulation via the Final Rule, which, among other things, would impose costs and restrict or burden the State's choices in implementing its Federally-assisted highway program.

22.    Plaintiff State of Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Iowa brings this suit through its Attorney General, Brenna Bird. She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2. Her address is 1305 E. Walnut St., Des Moines, Iowa 50309. The Attorney General believes Iowa will be harmed by the Final Rule, and therefore joins.

23.    The State of Indiana is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

24.    The Attorney General of the State of Indiana is authorized to bring civil actions on behalf of the State, its agencies, and its citizens. *See* Ind. Code §§ 4-6-2-1(a), 4-6-1-6, 4-6-3-2(a); *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213, 218-19 (Ind. 2009).

25.     Within the State of Indiana, there are more than 4,819 center-line miles of National Highway System.[8] Indiana continues to invest in expanding and improving its highways to improve safety, enhance mobility, and boost economic growth and development.[9] These and other projects will certainly result in additional vehicular traffic and thus, $CO_2$ emissions.

26.     Plaintiff State of Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Iowa brings this suit through its Attorney General, Brenna Bird. She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2. The Attorney General believes Iowa will be harmed by the Final Rule, and therefore joins.

27.     The State of Kansas is a sovereign State of the United States of America. The State sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. The Attorney General of Kansas has authority to sue on behalf of the State, Kan. Stat. Ann. § 75-702(a), and believes Kansas will be harmed by the Final Rule, and therefore joins.

---

[8] *See Estimated MAP-21 NHS Mileages*, U.S. DEPARTMENT OF TRANSPORTATION FEDERAL HIGHWAY ADMINISTRATION,
https://www.fhwa.dot.gov/planning/national_highway_system/nhs_maps/map21estmileage.cfm   (last visited Dec. 19, 2023).
[9] *See, e.g.*, *INDOT Major Projects*, INDIANA DEPARTMENT OF TRANSPORTATION, https://in.gov/indot/projects/ (last visited Dec. 19, 2023); *INDOT Other Projects*, INDIANA DEPARTMENT OF TRANSPORTATION, https://www.in.gov/indot/projects/other-projects/ (last visited Dec. 19, 2023).

28.     The State of Mississippi is a sovereign State of the United States of America. The State sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

29.     The Attorney General of the State of Mississippi is authorized to bring legal actions on behalf of the State and its citizens. Miss. Const. art. VI, § 173; Miss. Code Ann. § 7-5-1; *see also Gandy v. Reserve Life Ins. Co.*, 279 So. 2d 648, 649 (Miss. 1973).

30.     Within the State of Mississippi, there are over 3,800 center-line miles of National Highway System.[10] Earlier this year, state lawmakers invested over $2 billion toward infrastructure projects that include plans to expand and improve sections of the National Highway System to improve safety, enhance mobility, and boost economic growth and development.[11] These and other projects will certainly result in additional vehicular traffic and thus, $CO_2$ emissions.

31.     The State of Montana is a sovereign State of the United States of America. The State sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

32.     The State of Montana is a large State with long stretches of Interstate and National Highway System miles that help connect the nation and the people and

---

[10]   U.S. DOT Estimate NHS Mileages, *supra* note 1.

[11]   *See, e.g.*, Press Release, *Governor Reeves Signs Bills Investing Over $2 Billion Toward Transportation and Infrastructure Improvements* (Apr. 20, 2023), https://mailchi.mp/b1d352597194/governor-tate-reeves-volunteer-firefighter-1053647?e=ae3824fee2 (last visited Dec. 18, 2023); WMC, *MDOT gets $25M to widen I-55 in DeSoto County* (Apr. 10, 2023), https://www.actionnews5.com/2023/04/10/mdot-gets-25m-widen-i-55-desoto-county/ (last visited, Dec. 18, 2023).

businesses of Montana to the nation and world.  A modern highway system in good or better condition supports the economy of the State, the quality of life of its residents, and the safety of travelers. The improvement and preservation of the highway system in Montana is supported in significant part by the Montana Department of Transportation ("MDT") which, like other state DOTs, receives apportioned and other funds from Defendant Federal Highway Administration. Receipt of those funds subjects MDT to various regulations, including by defendant Agencies. Some highway investments, and straightforward economic growth, can result in additional $CO_2$ emissions.  The State of Montana seeks the ability to continue to make decisions to maximize the benefits of its highway investments. The Final Rule would impose costs and restrict or burden the State's ability to do so.

33.    Nebraska is a sovereign State of the United States. It sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

34.    The Attorney General of Nebraska is authorized to bring legal actions on behalf of the State and its citizens. Neb. Rev. Stat. § 84-203.

35.    Nebraska is home to over 3,700 center-line miles of the National Highway System[12] and over 480 miles of Interstate.[13] Given Nebraska's central location, the State's highways play an important role in ensuring that people and goods can move across the country. The Nebraska Department of Transportation

---

[12]    U.S. DOT Estimate NHS Mileages, *supra* note 1.
[13]    *FAQ's and Frequently Requested Information*, Nebraska Department of Roads, https://perma.cc/3QZ9-VMFX (last visited Dec. 19, 2023).

oversees Nebraska's vast highway system and receives funds from Defendant Federal Highway Administration.

36.     State of Nebraska officials recently announced the launch of various expensive, years-long highway construction and maintenance projects. The infrastructure projects, projected to cost $689 million, will make Nebraska's highways safer and more efficient. And the projects will certainly result in increased traffic and a corresponding increase in $CO_2$ emissions.

37.     The State of North Dakota is a sovereign State of the United States. The Attorney General of North Dakota "may institute legal proceedings necessary to protect the interests of the state and defend all actions affecting public interest." *Bonniwell v. Flanders*, 62 N.W.2d 25, 28 (N.D. 1953); *see also* N.D.C.C. § 54-12-01. North Dakota brings this lawsuit, through its Attorney General, to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

38.     Within the State of North Dakota, there are over 3,600 center-line miles of National Highway System.[14] The North Dakota Department of Transportation ("NDDOT"), like other State DOTs, receives funding from the Federal Highway Administration which subjects NDDOT to numerous regulations, including the Final Rule challenged in this lawsuit. As a relatively rural State with many industries that utilize heavy equipment, and which frequently experiences severe winter conditions, the Final Rule's unlawful mandate to reduce vehicular $CO_2$ emissions will negatively impact the State's economy and the well-being of its residents.

---

[14]   U.S. DOT Estimate NHS Mileages, *supra* note 1.

39.    The State of Ohio is a sovereign State of the United States of America. The State sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

40.    The Attorney General of the State of Ohio "is the chief law officer for the state and all its departments." Ohio Rev. Code 109.02; *see* Ohio Constitution, Art. III, § 1. He also has all the common-law powers understood, at the time of the Ohio Constitution's adoption, to inhere in the position of Attorney General.  *State ex rel. Merrill v. Ohio Dep't of Nat. Res.*, 130 Ohio St. 3d 30, 38 (Ohio 2011).

41.    Within the State of Ohio is the Nation's fifth largest interstate system, with over 8,000 lane miles, and Ohio is located within a day's drive of more than 60% of the populations of the United States and Canada.[15] Ohio, through the Ohio Department of Transportation ("ODOT"), strives to maintain its National Highway System, which consists of roadways important to the Nation's and the State's economy, defense, and mobility. Highway investments, and economic growth, will result in additional greenhouse-gas emissions from vehicles, and the State of Ohio will continue to make decisions to maximize all the benefits of its highway investments. Unlawful regulation will increase costs to the State of Ohio, its agencies, its citizens, and its industries and burden the State of Ohio's choices in implementing its highway programs.

---

[15]    *2023 ODOT Facts Book*, Ohio Dep't of Transp., https://www.transportation.ohio.gov/about-us/facts-book/facts-book-archives/odot-facts-book-000-0-2022-23.

42.     The State of Oklahoma is a sovereign state of the United States of America. The State sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

43.     Oklahoma brings this suit by and through its Attorney General, Gentner Drummond, who is authorized by Oklahoma law to sue on Oklahoma's behalf. OKLA. STAT. tit 74, § 18(b)(A)(2)-(3).

44.     Oklahoma has over 4,500 miles of roadways within the National Highway System.[16] Highway transportation is vital to the economy and the welfare of the people in Oklahoma. Indeed, the Oklahoma Legislature declared it to be essential. "Recognizing that safe and efficient highway transportation is a matter of important interest to all the people in the state, the Legislature … determine[d] and declare[d] that an integrated system of roads and highways is essential to the general welfare of the State of Oklahoma." OKLA. STAT. tit 69, § 101(a). Oklahoma sues to defend its ability to make choices in support of highway transportation, the economy, and the welfare of the people of Oklahoma.

45.     The State of South Carolina is a sovereign State of the United States of America. The State sues to vindicate its sovereign, quasi-sovereign, proprietary, and parens patriae interests. The Attorney General of South Carolina has authority to sue on behalf of the State, *Condon v. State*, 583 S.E.2d 430, 434 (S.C. 2003), and believes South Carolina will be harmed by the Final Rule, and therefore joins.

---

[16]   *Id.*

46.     Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary, and *parens patriae* interests. Utah brings this suit through its Attorney General, Sean D. Reyes. He is authorized by Utah law to sue on the State's behalf. *See* Utah Const. art. VII, § 16; Utah Code § 67-5-1.

47.     Within the State of Utah, there are over 2,400 center-line miles of National Highway System.[17] The Utah Department of Transportation has over 200 projects scheduled or already under construction with a combined value of over $3 billion, many of which will expand and improve sections of the National Highway System.[18] These and other projects will result in additional vehicular traffic and thus, $CO_2$ emissions.

48.     The Commonwealth of Virginia is a sovereign State of the United States of America.  Virginia sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

49.     The Attorney General of the Commonwealth of Virginia is the chief legal officer of the Commonwealth of Virginia and has the duty under Va. Code § 2.2-513 to "represent the interests of the Commonwealth … in matters before or controversies with the officers and several departments of the government of the United States."

---

[17]   *Id.*

[18]   *UDOT Announces Major Protects for 2023 and Reminds Drivers to Be Safe in Work Zones as Highway Construction Ramps Up*, UTAH DEP'T OF TRANSP., https://udot.utah.gov/connect/2023/04/20/udot-announces-major-projects-for-2023-and-reminds-drivers-to-be-safe-in-work-zones-as-highway-construction-ramps-up/#:~:text=In%202023%2C%20UDOT%20has%20217,themselves%20and%20construction%20crews%20safe (last visited Dec. 19, 2023).

Further, "all legal service in civil matters for the Commonwealth … including the conduct of all civil litigation in which [it is] interested, shall be rendered and performed by the Attorney General." Va. Code Ann. § 2.2-507.

50.    The Commonwealth of Virginia contains over 4,000 center-line miles of National Highway System.[19] Virginia continues to add to the highway system throughout the Commonwealth through upcoming planned and funded projects including capacity expansions to Interstates 64, 95, and 81.

51.    West Virginia is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

52.    The Attorney General of the State of West Virginia "is the State's chief legal officer[.]" *State ex rel. McGraw v. Burton*, 569 S.E.2d 99, 107 (W. Va. 2002). His "inherent constitutional functions . . . include . . . ensuring that . . . legal policy and positions [asserted] by the State of West Virginia and State entities, particularly before tribunals," reflect "meaningful consideration of the potential effects of such legal policy and positions on the full range of State entities and interests[.]" *Id.* at 115–16. His express statutory duties include "appear[ing] as counsel for the state in all causes pending . . . in any federal court[] in which the state is interested[.]" W. Va. Code § 5-3-2.

---

[19]    U.S. DOT Estimate NHS Mileages, *supra* note 1.

53.     West Virginia is a rural State with 1,988 center-line miles of National Highway System roads.[20] The State is hard at work improving and expanding its road system with "$4 billion in active construction projects" as of December 12, 2023.[21] These projects are critical in a region that has sometimes struggled with economic isolation and underdevelopment—but they could also be expected to increase $CO_2$ emissions from additional traffic.

54.     West Virginians depend on fossil fuels for their livelihoods and other activities. Their average daily commutes equal or exceed 30 minutes in 22 counties, with average commutes in one county exceeding 42 minutes.[22] Because most West Virginians get to work by automobile,[23] they drive many miles in a year's time. Indeed, the average West Virginian logs 16,876 miles per year.[24] Few West Virginians own all-electric vehicles,[25] which means that most rely on fossil fuels for their

---

[20]   *Trends, Drivers, and Opportunities*, WEST VIRGINIA DIVISION OF TRANSPORTATION at 3 (Feb. 2021), https://transportation.wv.gov/highways/programplanning/LRTP/Documents/FactSheet_Funding_Fin al.pdf.

[21]   Jeff Jenkins, *Wriston: State passes $1B mark in highway projects bid out this year*, METRONEWS (Dec. 12, 2023), https://wvmetronews.com/2023/12/12/wriston-state-passes-1b-mark-in-highway-projects-bid-out-this-year/.

[22]   *Mean Commuting Time for Workers, Annually: West Virginia*, FEDERAL RESERVE BANK OF ST. LOUIS (2022), https://fred.stlouisfed.org/release/tables?eid=318730&rid=415.

[23]   *West Virginia Transportation by the Numbers*, U.S. DEPARTMENT OF TRANSPORTATION, at 2 (Jan. 2020), https://www.bts.dot.gov/sites/bts.dot.gov/files/states2020/West_Virginia.pdf.

[24]   *Average miles driven per year by Americans*, METROMILE (Sept. 13, 2021), https://www.metromile.com /blog/average-miles-driven-per-year-by-americans/.

[25]   *Electric Vehicle Registrations by State*, U.S. DEPARTMENT OF ENERGY (Jul. 2023), https://afdc.energy.gov/data/10962.

transportation. West Virginians also drive older vehicles[26] and more pickup trucks,[27] which emit more $CO_2$ per mile because they are generally less fuel efficient.[28]

55.     This driving-centric economy has significant revenue consequences for the State. In 2020, motor fuel taxes contributed $427 million to the State Road Fund—that's $22 million more than the State Road Fund received from federal aid.[29]

56.     Wyoming is a sovereign State of the United States. It sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests, as well as its rights and prerogatives as a State under Federal highway statutes.

57.     The Attorney General of the State of Wyoming is authorized to bring legal actions on behalf of the State and its citizens. Wyo. Stat. Ann. § 9-1-603.

58.     The State of Wyoming is a large State with long stretches of Interstate and National Highway System miles that help connect the nation and the people and businesses of Wyoming to the nation and world.  A modern highway system in good or better condition supports the economy of the State and the quality of life of its residents. The improvement and preservation of the highway system in Wyoming is supported in significant part by the Wyoming Department of Transportation (WYDOT) which, like other state DOTs, receives funds from Defendant Federal

---

[26] *Autos Drive West Virginia Forward*, ALLIANCE FOR AUTOMOTIVE INNOVATION (2023), https://www.autosinnovate.org/resources/insights/wv (noting that "[t]he West Virginia average age of vehicles is 13.1 years" in comparison to "[t]he national average [of] 12.2").

[27] iSeeCars, *Which states have the most pickup trucks*, WANE.COM (Jun. 19, 2022), https://www.wane.com/top-stories/which-states-have-the-most-pickup-trucks/ (reporting that West Virginia ranks seventh).

[28] *Cf. The 2022 EPA Automotive Trends Report*, U.S. Environmental Protection Agency (Dec. 2022), at ES-2 – ES-4, https://www.epa.gov/system/files/documents/2022-12/420s22001.pdf.

[29] *Trends, Drivers, and Opportunities*, *supra* note 20 at 1.

Highway Administration. WYDOT undertakes its work in compliance with Federal requirements and strives to make effective decisions on the investment of highway funds to provide maximum benefit to the State, enhancing the economy and the quality of life. However, some highway investments and projects, and straightforward economic growth, can result in additional $CO_2$ emissions. Wyoming seeks the ability to continue to make decisions to maximize the benefits of its highway investments by avoiding the harm of being subject to the Final Rule.

<u>Defendants</u>

59.     Defendant Federal Highway Administration is an agency within the U.S. Department of Transportation. Its headquarters are located in the District of Columbia. FHWA is subject to the Administrative Procedure Act.

60.     Defendant Shailen Bhatt is the Administrator of FHWA. His role is to carry out the "duties and powers vested in the Secretary by chapter 4 of title 23 for highway safety programs, research, and development related to highway design, construction and maintenance, traffic control devices, identification and surveillance of accident locations, and highway-related aspects of pedestrian safety." 49 U.S.C. § 104. He is also charged with performing "additional duties and powers prescribed by the Secretary," *id.*, which includes authority to administer certain chapters of title 23 of the U.S. Code. *See* 49 CFR 1.85(a).

61.     Defendant U.S. Department of Transportation ("U.S. DOT") is an executive department, 5 U.S.C. § 101, located in the District of Columbia. As an executive department, U.S. DOT is subject to the Administrative Procedure Act.

62.     Defendant Pete Buttigieg is the Secretary of the Department of Transportation. He is responsible for establishing and implementing a national highway performance program. 23 U.S.C. § 119(a).

63.     Defendant Joseph R. Biden is sued in his official capacity as the President of the United States. He signed Executive Order No. 13990, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis" on January 25, 2021, [Exhibit 2] and Executive Order No. 14008, "Tackling the Climate Crisis at Home and Abroad" on February 1, 2021, [Exhibit 3].

64.     Defendants U.S. DOT and FHWA issued the Final Rule in response to President Biden's Executive Orders 13990 and 14008. Final Rule at 85365, 85369.

## JURISDICTION AND VENUE

65.     The Court has federal subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702–03.

66.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, the U.S. Constitution, and the Court's equitable powers.

67.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e). Defendants are United States agencies and officers sued in their official capacities. Plaintiff Commonwealth of Kentucky is a resident of every judicial district in its sovereign territory, including this judicial district and division.

68.     The Paducah Division of the Western District of Kentucky is a proper division for this action because a substantial part of the events giving rise to this

action occurred in the division, Kentucky's Attorney General maintains a physical office within the division at Benton, Kentucky, and no defendant resides in the Commonwealth.

## FACTUAL BACKGROUND

### The 2017 GHG Rule and its Repeal

69.    On January 18, 2017, the Agencies issued a rule requiring States to establish targets regarding a measure of on-road $CO_2$[30] emissions. *National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program*, 82 Fed. Reg. 11 at 5970 *et seq.* (Jan. 18, 2017) ("2017 Rule") [Exhibit 4]. This rule required states to set targets for $CO_2$ emissions relative to 2017 emissions levels. *Id.* at 6018.

70.    For its authority to promulgate the 2017 Rule, the Agencies cited to 23 U.S.C. § 150(c)(3). *Id.* at 5994.

71.    That provision was added to the U.S. Code by the 2012 Moving Ahead for Progress in the 21st Century Act. It directs the Secretary of the Department of Transportation to establish:

> (i)    minimum standards for States to use in developing and operating bridge and pavement management systems;
> (ii)   measures for States to use to assess-
>      I.   the condition of pavements on the Interstate system;

---

[30]   $CO_2$—carbon dioxide—is a naturally occurring gas that is essential for plant life and an important component of Earth's air. While $CO_2$ comes from both natural and anthropogenic sources, like the burning of fossil fuels, natural sources are predominant. *See Carbon Dioxide 101*, U.S. DEPARTMENT OF ENERGY NATIONAL ENERGY TECHNOLOGY LABORATORY, https://netl.doe.gov/coal/carbon-storage/faqs/carbon-dioxide-101.

      II.   the condition of pavements on the National Highway System (excluding the Interstate);
    III.  the condition of bridges on the National Highway System;
    IV.  the performance of the Interstate System; and
     V.  the performance of the National Highway System (excluding the Interstate System)

(iii)    minimum levels for the condition of pavement on the Interstate System, only for the purposes of carrying out section 119(f)(1); and

(iv)    the data elements that are necessary to collect and maintain standardized data to carry out a performance-based approach.

72.    Under 23 U.S.C. § 150(c)(3), all of these standards are to be established "for the purpose of carrying out Section 119" of title 23, which requires the "Secretary [to] establish and implement a national highway performance program." 23 U.S.C. § 119(a). The purposes of that program are "to provide support for the condition and performance of the National Highway System," "for the construction of new facilities on the National Highway System," and "for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters," and to "ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established" in a State's asset management plan. 23 U.S.C. § 119(b).

73.    Nothing in Section 119 or Section 150 refers to or gives the Agencies authority to mandate the States reduce $CO_2$ or other GHG emissions.

74.    Indeed, that was the determination of the Agencies when, in May of 2018, they repealed the 2017 Rule. *See National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the*

*Interstate System, and Congestion Mitigation and Air Quality Improvement Program*, 83 Fed. Reg. 105 at 24920 (May 31, 2018) (hereinafter "2018 Repeal") [Exhibit 5]. In repealing the rule, the Agencies found that interpreting the term "performance" to include "environmental performance" was "a strained reading of the statutory language in section 150, and one that did not fully consider the limitations imposed by the statute itself." *See* 2018 Repeal at 24923–24924.

75.     The Agencies also noted that there was nothing in the law relating to the National Highway Performance Program ("NHPP") that specifically directed or required the Agencies to adopt a GHG measure. *See id*. "Instead [the law] encourage[s] State DOTs and MPOs to consider a variety of ways to incorporate environmental considerations under their existing authority." *Id*. at 24923. Thus, the Agencies determined it was for the States, not the Agencies, to determine how, if at all, to address $CO_2$ emissions.

**President Biden's Climate Policy**

76.     U.S. DOT and FHWA began reconsidering their stance after President Biden proclaimed there to be a "climate crisis" that all agencies needed to address. In Executive Order 13990, President Biden "direct[ed] all executive departments and agencies to immediately review and . . . take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with [the Administration's policy of reducing greenhouse gas emissions], and to immediately commence work to confront the climate crisis." Exec. Order 13990 at Section 1. In Executive Order 14008, the President asserted that "[r]esponding to the climate crisis

will require both significant short-term global reductions in greenhouse gas emissions and net-zero global emissions by mid-century or before." Exec. Order 14008 at Section 101.

77.     The President said his purpose in issuing Executive Order 14008 was to "build[] on" his actions with respect to the Paris Agreement, which included having the United States rejoin as a party to the Agreement despite the Trump Administration's earlier withdrawal from the Agreement. *Id*. at Section 102.

78.     The Paris Agreement exists under the United Nations Framework Convention on Climate Change ("UNFCCC"), which the U.S. ratified in 1992 with the advice and consent of the Senate. The Senate has not voted on whether to join the Paris Agreement.[31] Although the United Nations asserts the Paris Agreement is a "legally binding international treaty" on climate change,[32] the Obama Administration joined the Agreement with the view that it was "an executive agreement containing no substantive, legal obligations beyond the UNFCCC," and, therefore, believed it did not require the advice and consent of the Senate.[33] Similarly, when President Biden had the United States rejoin the Paris Agreement, he did not seek the advice and consent of the Senate.

79.     The Paris Agreement calls for all parties—194 countries plus the European Union[34]—to reduce greenhouse gas emissions, ostensibly to limit the global

---

[31]   *United States Rejoins the Paris Agreement on Climate Change: Options for Congress*, Congressional Research Service (Feb. 25, 2021), https://crsreports.congress.gov/product/pdf/IF/IF11746.
[32]   *The Paris Agreement*, United Nations, https://www.un.org/en/climatechange/paris-agreement (last visited Dec. 7, 2023).
[33]   *Supra* note 29.
[34]   *Supra* note 30.

temperature increase during this century to 1.5 degrees Celsius (2.7 degrees Fahrenheit).[35]

80.    The Sixth Assessment Report by the Intergovernmental Panel on Climate Change ("IPCC") estimates that meeting the temperature goal requires decreasing global net $CO_2$ emissions to net-zero by 2050. *National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure*, 87 Fed. Reg. 135 at 42406 ("Proposed Rule"), [Exhibit 6]. This estimate is based on the IPCC belief that there is a consensus among scientists that global warming is largely caused by anthropogenic sources.[36] However, there is no consensus.[37] First, scientists are by no means unanimous that global warming is largely the result of anthropogenic sources.[38] Second, many scientists

---

[35] *See Key aspects of the Paris Agreement*, UNITED NATIONS, https://unfccc.int/most-requested/key-aspects-of-the-paris-agreement#:~:text=2)%20%E2%80%93%20The%20Paris%20Agreement%2C,'climate%20neutrality'%20(Art (last visited Nov. 29, 2023).

[36] *See, e.g.*, Gabriele C. Hegerl, et al., *Understanding and Attributing Climate Change*, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *available at* https://www.ipcc.ch/site/assets/uploads/2018/02/ar4-wg1-chapter9-1.pdf; Sergey K. Gulev, et al., *Chapter 2: Changing State of the Climate System*, IPCC SIXTH ASSESSMENT REPORT, *available at* https://www.ipcc.ch/report/ar6/wg1/chapter/chapter-2/ (2021) ("Change in [temperature] from natural factors since 1750 is negligible in comparison to anthropogenic drivers (very high confidence).").

[37] The Merriam-Webster dictionary defines consensus as being "general agreement: unanimity." https://www.merriam-webster.com/dictionary/consensus.

[38] *See* Earl J. Ritchie, Fact Checking the Claim of 97% Consensus on Anthropogenic Climate Change, Forbes (Dec. 14, 2016), https://www.forbes.com/sites/uhenergy/2016/12/14/fact-checking-the-97-consensus-on-anthropogenic-climate-change/?sh=60e04bf71157 (finding that to the extent there is a consensus, it is lower than the 97% that is popularly cited—even when looking at the articles often cited for that number); Richard Harris, *'Uncertain' Science: Judith Curry's Take on Climate Change*, NPR (Aug. 22, 2013), https://www.npr.org/2013/08/22/213894792/uncertain-science-judith-currys-take-on-climate-change (discussing climate scientist Judith Curry's belief that "[i]f all other things remain equal, it's clear that adding more carbon dioxide to the atmosphere will warm the planet," but "not all things are equal" and there are many uncertainties and unknowns, so she is dubious about "a strong consensus" about the role of humans in climate change).

question the validity of the studies or data.[39] The models of the future used by the IPCC have not been demonstrated to account for the changes in key variables impacting the climate.[40] Indeed, some of the scenarios used by the IPCC "represent[] not just an implausible future," but also deviate from the present reality.[41]

81.    This failure to account for current realities is revealed in the plans to meet the global temperature goal. Although the Paris Agreement sets a "global" goal, each country and the European Union decides its own plans for reducing GHG emissions and they are by no means equal. For instance, under existing Nationally Determined Contributions (NDCs), China is planning to increase GHG emissions until 2030,[42] whereas Europe and the United States have goals to significantly decrease GHG emissions by 2030.[43]

82.    The use of coal-fired power generation demonstrates the inequality starkly. Even though the United States has decreased coal generation by 96

---

[39]  *See id.*; Ross McKitrick, *The IPCC's attribution methodology is fundamentally flawed,* CLIMATE ETC. (Aug. 18, 2021), https://judithcurry.com/2021/08/18/the-ipccs-attribution-methodology-is-fundamentally-flawed/ (arguing that the "Optimal Fingerprinting" methodology used by the IPCC in its sixth report to attribute climate change to greenhouse gases "is seriously flawed and its results are unreliable and largely meaningless"); Kenneth P. Green, *Doomsday predictions rely on flawed climate models*, THE FRASER INSTITUTE BLOG (Feb. 15, 2022), https://www.fraserinstitute.org/blogs/doomsday-predictions-rely-on-flawed-climate-models#:~:text=But%20empirical%20evidence%20taken%20from,10%20years%20to%20save%20the.

[40]  *See* Roger Pielke, Jr. & Justin Ritchie, *How Climate Scenarios Lost Touch With Reality*, 37 ISSUES IN SCIENCE & TECHNOLOGY 4 (2021), *available at* https://issues.org/climate-change-scenarios-lost-touch-reality-pielke-ritchie/.

[41]  *Id.* (explaining that for the IPCC, [i]t's as if the profound changes in the world's mix of energy resources and technologies in the past three decades, from the rise of natural gas to the growth of renewable energy, had never happened").

[42]  *China*, CLIMATE ACTION TRACKER, https://perma.cc/W5NG-57JJ
  (explaining that "[u]nder China's NDC targets, the country's emission levels would reach 14.0 GtCO2e/year in 2030, an increase of 28% from 2010 levels").

[43]  *United Kingdom*, CLIMATE ACTION TRACKER, https://perma.cc/ST62-V79K; *USA*, CLIMATE ACTION TRACKER, https://perma.cc/G3KV-VHSB.

gigawatts since the Paris Agreement—far surpassing any other country's decrease[44] —there has been a cumulative net worldwide increase of 206 gigawatts.[45] This is because other countries have continued to increase the use of coal-fired power. In particular, China has increased its coal-fired power generation by 233 gigawatts since 2015.[46]

## 2022 Proposed Rule

83.     According to U.S. DOT and FHWA, President Biden made reducing greenhouse gas emissions a "national priority" through Executive Orders 13990 and 14008. *See* Proposed Rule at 42046.

84.     The Agencies concluded that the repeal of the 2017 Rule "conflicts with th[e] national objective[]" of reducing greenhouse gas emissions. *Id*. Therefore, the Agencies proposed "reestablish[ing] a GHG performance measure." *Id*. While the Proposed Rule was "similar to the repealed 2017 GHG measure." *id*., it went further by setting emissions targets the States must meet. Specifically, it required States to reduce $CO_2$ emissions to meet the Biden Administration's economy-wide goal of having "net-zero" emissions by 2050. *Id*. at 42402.

85.     The Agencies were explicit that they were proposing the rule because of the President's policy wishes. They described the Proposed Rule as "essential" to achieving the "Administration's target of net-zero emissions, economy-wide, by 2050"

---

[44]   The next highest decrease is the United Kingdom with a decrease of 18 gigawatts.
[45]   *Net Additional Coal Generation Capacity Since the Paris Agreement*, ENERGY POLICY RESEARCH FOUNDATION (2023), *available at* https://eprinc.org/wp-content/uploads/2023/11/EPRINC-Chart2023-44-GlobalPowerPlantAdditionsSinceTheParisAccords-Version1.pdf.
[46]   *Id*. This is more than five times the amount increased by any other country.

and believed it "would help the United States confront the increasingly urgent climate crisis."[47] *Id.* at 42402–03.

86.     Accordingly, the Proposed Rule mandated that State departments of transportation and metropolitan planning organizations establish declining $CO_2$ targets that "align with the Administration's net-zero targets as outlined in the national policy established under Executive orders [13990 and 14008]." *Id.* at 42401.

87.     In the Proposed Rule, the Agencies asserted they had legal authority for the Rule under 23 U.S.C. §§ 150 and 119, as well as 23 U.S.C. §§ 101(b)(3)(G); 134(a)(1); 134(c)(1); and 135(d)(1) and (d)(2). *Id.* at 42403.

88.     The States party to this challenge submitted comments opposing the proposed rule. Kentucky Attorney General Daniel Cameron led a comment letter on behalf of the Commonwealth of Kentucky and nineteen other states including South Dakota, Alabama, Alaska, Arkansas, Florida, Kansas, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, Utah, Virginia, West Virginia and Wyoming, who are parties to this case. [Exhibit 7]. The Transportation Departments of Idaho, Montana, North Dakota, South Dakota, and Wyoming also submitted a comment. [Exhibit 8]. The Florida Department of Transportation submitted its own comment, which also identified major flaws with the Proposed Rule. [Exhibit 9]. All of these comments disputed the Agencies' assertion of legal authority.

---

[47]  Scientists are not in agreement that there is a climate crisis. *See, e.g., World Climate Declaration*, *available at* https://clintel.org/world-climate-declaration/ (A global network of scientists asserting there is no climate crisis and specifically that "[t]here is no statistical evidence that global warming is intensifying hurricanes, floods, droughts and suchlike natural disasters, or making them more frequent").

**2023 Final Rule**

89.    On December 7, 2023, the Agencies published the Final Rule in the Federal Register.

90.    Despite having the benefit of numerous comments pointing out the constitutional and statutory violations, including comments from the Plaintiffs, the Final Rule—while making some clarifications—does not address the foundational issues with the rule.

91.    The Final Rule adds a new greenhouse gas performance measure to the existing FHWA national performance measures to be used by states to assess performance of the National Highway System.

92.    The Final Rule requires State DOTs and MPOs to "establish declining targets for reducing $CO_2$ emissions generated by on-road mobile sources." Final Rule at 85364. Targets for the first four-year period must be established and reported to FHWA no later than February 1, 2024. *Id.* at 85372.

93.    The Final Rule also requires State DOTs and MPOs to report biennially on their progress, which FHWA will use to "determine whether a State DOT has made significant progress toward the achievement of the 4-year target for the GHG measure." *Id.*

94.    State DOTs are required to calculate and report both the GHG measure (the "percent change in on-road tailpipe $CO_2$ emissions on the NHS relative to the reference year") and the GHG metric (the "tailpipe $CO_2$ emissions on the NHS for a given year computed in million metric tons (mmt) and round[ed] to the nearest

32

hundredth"). *Id.* at 85364, 85372. They are to use their "best available vehicle miles traveled (VMT) data when establishing targets, reporting baseline and actual performance and discussing progress." *Id.* at 85372.

95.    As with the 2017 rule and the Proposed Rule, the Agencies assert that their authority for this imposition on the States comes from 23 U.S.C. § 150(c). The Agencies argue that because 23 U.S.C. § 150(c) "clearly directs FHWA to establish performance measures that the State DOTs can use to assess performance of the Interstate and non-Interstate [National Highway System]," the agencies have authority to require State DOTs to establish targets to reduce $CO_2$ emissions to address the "system's environmental performance." *Id.* at 85364.

96.    In the Proposed Rule, the Agencies also cited the Infrastructure Investment and Jobs Act[48] as a source of authority for the rule. *See* Proposed Rule at 42408. However, in the Final Rule, the Agencies acknowledge that the IIJA "does not explicitly direct FHWA to assess environmental performance." Final Rule at 85368. Instead, the Agencies cite to programs included in the IIJA, such as the Carbon Reduction Program, as "examples of Congress' express focus on using transportation programs to reduce GHG emissions from transportation sources." *Id.*

**Injury to the States**

97.    The Final Rule causes an injury in fact on the Plaintiff States. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

---

[48]    Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, §§ 50201-222, 135 Stat. 429 (2021) *available at https://www.congress.gov/117/plaws/publ58/PLAW-117publ58.pdf* [hereinafter "IIJA"].

98.     By February 1, 2024, the States must establish initial targets for the GHG measure and report them to the Agencies. Final Rule at 85372 ("In the final rule, FHWA establishes that State DOTs will establish initial targets for the GHG measure and report them no later than February 1, 2024.").

99.     As "the object of" the Final Rule's requirement, "there can be 'little question' that the rule [injures] the States." *W. Va. v. EPA*, 142 S. Ct. 2597, 2606 (2022) (citing *Lujan*, 504 U.S. at 561–62). To meet the injury requirement of standing, the Plaintiff States need show nothing else; they are the ones targeted by the Final Rule's requirements.

100.     This injury is not negated by the Agencies eliminating the language in the Proposed Rule that explicitly mandated the States meet the Administration's emissions target of net-zero by 2050. *See* Proposed Rule at 42401 ("[T]he proposed rule would require State DOTs and MPOs that have [National Highway System] mileage within their . . . boundaries . . . to establish declining $CO_2$ emissions targets to reduce $CO_2$ emissions generated by on-road mobile sources . . . that align with the Administration's net-zero targets."); *id.* at 42403 ("[A] requirement for State DOTs and MPOs to establish declining targets for reductions in tailpipe $CO_2$ emissions on the NHS . . . is vital to achieving 50 to 52 percent reductions by 2030 and net-zero emissions economy-wide by 2050."); Final Rule at 85372 (explaining it does not include the requirement present in the Proposed Rule that the GHG measure "demonstrate reductions toward net-zero targets").

101.    While the Proposed Rule's mandated emissions target of net-zero was an obvious display of the rule's unconstitutionality, the Final Rule's removal of that language does not mean there is no injury to the Plaintiff States or that the rule is lawful. The Final Rule remains fundamentally the same as the Proposed Rule: it requires States to establish, monitor and demonstrate progress toward a certain type of target for $CO_2$ emissions—declining targets—as mandated by the Agencies, who lack authority to impose such a mandate.

102.    Furthermore, the changes in the Final Rule to the emissions target language do not alter the Agencies' intent behind the rule. Even in the Proposed Rule, which contained the explicit mandated net-zero target language, the Agencies denied that the Rule mandated targets. Proposed Rule at 42401 ("The proposed rule would not mandate the level of the targets."). And in the Final Rule, the Agencies are clear they still believe the rule is essential to achieving the Administration's goal of reaching net-zero. *See, e.g.*, Final Rule at 85371 ("FHWA considers the GHG measure essential . . . to improve transportation sector performance and work toward achieving net-zero emissions economy-wide by 2050."). Just because the Agencies remove the language that explicitly mandates the States set declining targets to achieve net-zero by 2050 does not mean the actual impact of the rule will not be to force States to achieve net-zero by 2050. Indeed, the Final Rule says that "[i]f significant progress is not made for the target established for the GHG measure . . . then the State DOT shall document the actions it will take to achieve the GHG performance target." Final Rule at 85392. This is mandatory language that gives

States no ability to refuse to follow whatever GHG measure the Agencies impose on them.

103.    Achieving "net-zero"[49] by 2050 means drastic changes. According to the International Energy Agency, it will require "halting sales of new internal combustion engine passenger cars by 2035, and phasing out all unabated coal and oil power plants by 2040."[50] But most Americans still drive internal combustion engine passenger cars, and America's roads and infrastructure, including power grids, simply are not ready for the wholesale switch to electric vehicles.[51] Coal still provides almost 20 percent of electricity in the United States,[52] and provides over half of the electricity in eight states, including several of the Plaintiff States.[53] In Kentucky, almost seventy percent of all electricity is generated by coal.[54] Missouri and Wyoming both draw over seventy percent of their electricity from coal, and in West Virginia, coal produces almost ninety percent of the state's electricity.[55]

104.    Trying to reach net-zero to slow the average temperature increase also means the economy will take a hit. A 2023 study looked at various models and found that attempting to limit the temperature increase to 1.5 degrees Celsius would result

---

[49]    According to the Agencies in the Proposed Rule, "[n]et-zero . . . means that human activities produce no more greenhouse gases than they remove from the atmosphere." Proposed Rule at 42419.
[50]    *Net Zero by 2050*, INTERNATIONAL ENERGY AGENCY (May 2021), https://perma.cc/N23E-LRRD.
[51]    *See* Letter from 3,882 vehicle dealerships to President Biden, *available at* https://evvoiceofthecustomer.com/ (urging President Biden to pause the electric vehicle mandate because consumers are unwilling to purchase electric vehicles when there is a lack of reliable charging networks, concerns about electric grid stability, and issues with sourcing of materials).
[52]    *What is U.S. electricity generation by energy source?*, U.S. ENERGY INFORMATION ADMINISTRATION (Oct. 2023), https://www.eia.gov/tools/faqs/faq.php?id=427&t=3.
[53]    *Which U.S. States are Still Dependent on Coal for Electricity?*, COMMODITY.COM (Feb. 17, 2023), https://commodity.com/blog/coal-dependent-states/.
[54]    *Id.*
[55]    *Id.*

in a cost of 5.0% of GDP.[56] In contrast, the expected benefits only amount to 0.5% of GDP.[57] Notably, the Agencies do not try to address this huge discrepancy in costs and benefits. Instead, they simply say they cannot quantify the benefits, Final Rule at 85389, but nonetheless describe them as "substantial and justify finalizing this action," *id*. at 85369.

105.    It is the Plaintiff States and the people living in them who will be most adversely affected by this massive discrepancy in costs and benefits.

106.    Any mandated decline in on-road $CO_2$ emissions will disproportionately affect States with more rural areas. States with higher average annual miles per driver tend to be more rural.[58] On average, rural residents drive ten miles more per day than urban residents.[59]

107.    States with fewer metropolitan areas have fewer options available to them to reduce $CO_2$. Many of the ideas for how States can decrease GHG emissions—congestion pricing, road pricing, ramp metering, increased coordination with transit and non-motorized improvements, paying fees to scrap low mileage heavy duty vehicles—are options more conducive to metropolitan areas, not rural ones.[60] Low population densities limit the efficacy of public transit and congestion pricing as options that would reduce vehicle miles traveled and, consequently, $CO_2$ emissions.

---

[56]    Richard S.J. Tol, *Costs and Benefits of the Paris Climate Targets*, 14 CLIMATE CHANGE ECONOMICS 4 (2023), *available at* https://www.worldscientific.com/doi/10.1142/S2010007823400031.

[57]    *Id.*

[58]    Average miles driven per year by Americans, METROMILE (Sep. 13, 2021), https://perma.cc/3TW7-S7JT.

[59]    *Fact #759: December 24, 2012 Rural vs. Urban Driving Difference*s, DEPARTMENT OF ENERGY (Dec. 24, 2012), https://perma.cc/N3N5-LGEH.

[60]    *See, e.g.*, 2017 Rule at 5997; Proposed Rule at 42410 (2022).

Drivers in rural states drive relatively long distances, often in heavy-duty vehicles required for business or agriculture or because they need to be able to maneuver effectively in inclement weather and through altitude changes. The distance and terrain also make non-motorized and electric options impractical. For example, in Alaska, electric vehicle charging systems are non-existent outside a handful of urban areas, with Alaska accounting for just 0.1% of the country's total charging stations.[61] The transportation of people and goods over the long distances between communities in Alaska is dependent upon the burning of fossil fuels, which necessarily result in $CO_2$ emissions.

108.  Further, achieving declining targets is especially problematic in the context of economic growth, a goal of governments. The notice of the Final Rule acknowledges that a growing economy makes reducing $CO_2$ emissions "challenging." Final Rule at 85370.

109.  The Final Rule also imposes compliance costs. Even without the language requiring States to set declining targets to achieve net-zero, the Agencies estimate implementing the Final Rule will cost up to $12.7 million (discounted at 3 percent) for the first ten years of implementation. Final Rule at 85365.

110.  The Agencies estimate that the level of effort for setting the initial target—the one due on February 1, 2024—will be approximately twice that of subsequent reporting periods. *Id.* at 85388. The Regulatory Impact Analysis

---

[61]  *Charging Stations in Alaska: Your Ultimate Guide* (Dec. 9, 2023), https://energy5.com/charging-stations-in-alaska-your-ultimate-guide (last visited Dec. 18, 2023); *Electric Vehicle Charging Stations by State*, ELECTRIC DRIVER (Dec. 1, 2022), https://electricdriver.co/articles/electric-vehicle-charging-availability-by-state/ (last visited Dec. 18, 2023).

estimated State DOTs will need to expend 208 hours to set the initial declining target with a manpower cost to each State of $636,708.[62] And this does not take into account the disruptive harm of a rushed deadline.  February 1, 2024 is nearly 12 years after the passage of the statute which Defendants claim authorizes the Final Rule. Yet States are given only two months to establish declining targets and make a filing. The tight timeline will certainly have consequences for the other work streams of state transportation officials.

111.    By way of example, the state of Florida has 27 MPOs. In addition to the 27 targets that each MPO must set, 25 of Florida's 27 MPOs must also set additional targets for one or more urbanized areas in order to fully comply with the Rule. The Rule requires over 70 targets be set in the state of Florida alone.

112.    The cost of meeting the biennial reporting requirements of the rule is estimated to cost State DOTs and MPOs $2.7 million when discounted at 3 percent.[63]

## COUNT I
### The Final Rule exceeds the Agency's statutory authority.

113.    The Plaintiff States incorporate by reference the allegations in each of the foregoing paragraphs as if fully stated herein in their entirety.

114.    The Agencies lack authority to impose the Final Rule.

---

[62]    *Summary Report Economic Assessment: National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure RIN 2125-AF99 Proposed Rule*, at Table 5 (June 2022), *available at* https://www.regulations.gov/document/FHWA-2021-0004-0002 [hereinafter Economic Assessment]. The economic assessment estimates State DOTs will need to expend 104 hours each successive time, with a cost of $1,322,393 for each successive four-year period.
[63]    *Id*. at 22.

115. "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *W. Va. v. EPA*, 142 S. Ct. at 2609 (cleaned up, citation omitted).

116. When interpreting a statute "that confers authority upon an administrative agency, th[e] inquiry must be 'shaped, at least in some measure, by . . .' whether Congress in fact meant to confer the power the agency has asserted." *Id.* at 2607–08 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

117. According to the Agencies, they have authority to require States to reduce on-road $CO_2$ emissions under 23 U.S.C. §§ 150, 119, 101, 134, 135. Final Rule at 85365, 85367–69.

118. With respect to 23 U.S.C. § 150, the Agencies say that the term "performance" can include "environmental performance" because that interpretation is consistent with the national goals established under 23 U.S.C. § 150(b). *Id.* at 85364.

119. 23 U.S.C. § 150(b) does say "[i]t is in the interest of the United States to focus the Federal-aid highway program on . . . environmental sustainability." But the provision of Section 150 that actually authorizes the Agencies to establish performance measures says the Secretary "shall . . . limit performance measures only to those described in this subsection." 23 U.S.C. § 150(c)(2)–(3). The subsection referred to does not include a $CO_2$ measure. *See id.* The goals in subsection (b) are not

a directive to rewrite subsection (c). *See Kentucky v. Biden*, 23 F.4th 585, 604 (6th Cir. 2022) (explaining that purpose statements are not operative provisions so they "cannot confer freestanding powers . . . unbacked by operative language elsewhere in the statute"). Therefore, the performance measures are limited to those described in the subsection.

120.    Further, the Supreme Court has rejected expansive constructions of statutes if allowing the broader interpretation would mean relying on a "cryptic" delegation of authority. *See Brown & Williamson*, 529 U.S. at 160.

121.    The reference in § 150(b) to environmental sustainability as a national goal is not a clear grant of authority sufficient for the Agencies to require States to establish and demonstrate progress in achieving declining targets for on-road $CO_2$ emissions.

122.    Indeed, the Agencies acknowledge there is no clear grant of authority. In the Final Rule, the Agencies explain that, "[a]s noted in FHWA's May 2018 repeal of the 2017 GHG measure, nothing in the statute specifically requires FHWA to adopt a GHG emissions measure." Final Rule at 85368.

123.    Yet, the Agencies argue they have authority because "no provision of law prohibits FHWA from adopting a GHG emissions measure, despite ample opportunity for Congress to do so." *Id*. That assertion badly misapprehends how agency action is authorized. It is clearly not the case that an agency has authority to do everything other than what Congress expressly forbids it from doing. Rather, the inverse is true: an agency only has authority to do what Congress explicitly says it may do. If a

"cryptic" or "subtle" delegation of authority is insufficient, the complete absence of any delegation of authority certainly is insufficient.

124. Moreover, in contrast to the Agencies' seeming belief that nothing in statute prevents them from implementing this kind of rule, an interpretation of "performance" that includes "environmental performance" is not just an expansive interpretation, it is an interpretation that is inconsistent with the law.

125. The National Highway Performance Program ("NHPP") was originally created by the Moving Ahead for Progress in the 21st Century Act, which Congress signed into law in 2012.[64] "The NHPP provides support for the condition and performance of the National Highway System (NHS), for the construction of new facilities on the NHS, and to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in a State's asset management plan for the NHS."[65] The program has been continued and funded by both the Fixing America's Surface Transportation Act ("FAST Act"), Pub. L. 114-94 (Dec. 4, 2015), and the Bipartisan Infrastructure Law, which was enacted as the Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. 117-58 (Nov. 15, 2021).

---

[64] *MAP-21 – Moving Ahead for Progress in the 21st Century Act*, U.S. DEPARTMENT OF TRANSPORTATION FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION (last updated Jan. 17, 2023), https://www.fmcsa.dot.gov/mission/policy/map-21-moving-ahead-progress-21st-century-act

[65] *Fixing America's Surface Transportation Act or "FAST Act*," U.S. DEPARTMENT OF TRANSPORTATION FEDERAL HIGHWAY ADMINISTRATION, https://www.fhwa.dot.gov/fastact/factsheets/nhppfs.cfm; *see* Sec. 1106 of PL 112-141 (2012), *available at* https://www.govinfo.gov/content/pkg/PLAW-112publ141/pdf/PLAW-112publ141.pdf.

126. The NHPP "is the largest of the federal-aid highway programs."[66] For each of the next four fiscal years, Congress has appropriated over $29 billion for the program.[67] Funding for the NHS is state-focused. The NHPP continues the National Highways System Designation Act's practice of determining each state's funding based on a percentage established by statute.[68] Each state can then use the funds "to achieve national performance goals consistent with state and metropolitan planning."[69]

127. Under 23 U.S.C. § 150(c)(3), the minimum standards and measures to be established under the NHPP are "for the purpose of carrying out section 119." Section 119 defines eligibility criteria for projects funded under the National Highway Performance Program. To be eligible, the program must meet three requirements: 1) be part of a program that supports "progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System;" 2) be consistent with sections 134 and 135, and 3) be for one or more of the purposes delineated in the section. 23 U.S.C. § 119(d). The phrasing of

---

[66] *Surface Transportation Funding and Programs Under the Fixing America's Surface Transportation Act (FAST Act; P.L. 114-94)*, CONGRESSIONAL RESEARCH SERVICE (Feb. 2016), at 7, https://www.everycrsreport.com/files/20160218_R44388_45d356fde41643e8fa33b0b5208995c257b568 66.pdf.
[67] *National Highway Performance Program (NHPP) Fact Sheet*, U.S. DEPARTMENT OF TRANSPORTATION FEDERAL HIGHWAY ADMINISTRATION, https://www.fhwa.dot.gov/bipartisan-infrastructure-law/nhpp.cfm.
[68] *Id.*
[69] *Federal Highway Programs: In Brief*, CONGRESSIONAL RESEARCH SERVICE (Feb. 2022), at 5, https://crsreports.congress.gov/product/pdf/R/R47022#:~:text=NHPP%20is%20the%20largest%20of,vi rtually%20all%20other%20major%20highways.

the law is that a project must comply with both the first "*and*" second requirement, "*and*" be for one or more of the purposes in subsection (2).

128.   The Final Rule mandates action that does not meet all three requirements and, therefore, is not permissible under the statute.

129.   First, the goals that a program under 23 U.S.C. § 119 must support—infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the National Highway System—are "consistent with an interpretation of 'performance' that focuses on the *physical* condition of the system and the *efficiency* of transportation operations across the system." 2018 Repeal at 24924 (emphasis added). The goals do not support a broader interpretation that includes environmental performance. *Id*.

130.   Second, the purposes that are related to the environment are not ones that would encompass the GHG measure in the Final Rule. Purposes related to the environment in subsection (2) of Section 119(d) are not stand-alone eligibility parameters; the project must be one that focuses on infrastructure. Subsection (2) lists as one of the permissive purposes "environmental restoration and pollution abatement in accordance with section 328." Section 328 of title 23 refers to "environmental restoration and pollution abatement to minimize or mitigate the impacts of any transportation project funded under this title . . . [that] may be carried out to address water pollution or environmental degradation caused wholly or partially by a transportation facility." The specificity in this provision as to the type of issue that can be addressed—water pollution or environmental degradation caused

by a *transportation facility*—makes it clear this language is not a blank check authorizing the Agencies to promulgate a rule in response to *mobile on-road CO₂ sources*.

131.    Likewise, even though one of the delineated purposes in Section 119 is "[e]nvironmental mitigation efforts," the statute explicitly and clearly limits the scope of the permitted environmental mitigation efforts. By law, only those efforts that are "described in subsection (g)" of Section 119 are allowed. The efforts described in subsection (g) relate to natural habitats and wetlands. Nothing in the subsection refers to carbon emissions.

132.    Further, a general rule in aid of statutory construction is that "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).

133.    Within 23 U.S.C. § 150(c), paragraph (5) is the provision concerned with congestion and "on-road mobile source emissions." The provision has the purpose of carrying out section 149 of title 23, and that section does not list $CO_2$ as one of the covered pollutants. Yet, rather than respect that Congress had specifically addressed performance measures for emissions in paragraph (c)(5), the Agencies conclude that a general reference to "performance" is sufficient to justify mandatory measures regarding GHG emissions. On the contrary, applying ordinary rules of statutory construction makes plain that, because Congress expressly stated in paragraph 150(c)(5) how emissions were to be addressed, the rest of subsection 150(c)—including

paragraph (c)(3)—provides no authority to regulate emissions, including $CO_2$ emissions.

134.   The Agencies' interpretation—expanding the set of performance measures authorized by law— is contrary to, not merely in addition to, what Congress authorized in 23 U.S.C. § 150(c). In subsection 150(c), Congress plainly stated that the Agencies shall "limit performance measures only to those described in this subsection." 23 U.S.C. § 150(c)(2)(C). The words "limit" and "only" are clear, and their use expressly prohibits U.S. DOT and FHWA from attempting to expand the list of performance measures.

135.   Nothing in the IIJA gives the Agencies authority to promulgate the Final Rule either.

136.   The new language from IIJA makes it a purpose of the National Highway Performance Program to provide "support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." Pub. L. 117-58, section 11105; 23 U.S.C. § 119(b).

137.   This language does not authorize the Agencies to support activities that attempt to prevent those natural disasters or climate change more generally. Instead, it authorizes the Agencies only to support "activities to increase the resiliency of the National Highway System to *mitigate the cost of damages*" from natural disasters. The language is intended to address physical issues with roads, not $CO_2$ emissions in the air, and it is clearly meant to be responsive to damage, not preventative.

138.    The Agencies admit that Congress did not give them explicit authority to address on-road $CO_2$ emissions through the IIJA. Final Rule at 85368 ("The [IIJA] does not explicitly direct FHWA to assess environmental performance."). And if Congress did not explicitly give FWA such extraordinary authority, it does not have it. *See W. Va. v. EPA*, 142 S. Ct. at 2609.

139.    That there are programs in the IIJA that relate to carbon reduction and transportation emissions does nothing to change that. In fact, these programs make it obvious that Congress could have chosen to give the Agencies authority to address on-road carbon emissions, but clearly chose not to do so.

140.    The Agencies list six other provisions that "support FHWA's authority" for the Final Rule, Final Rule at 85368, but none of these clearly grant the Agencies authority to require states to set declining targets for on-road $CO_2$ emissions. The absence of a clear grant of authority means the Agencies do not have authority. *See Brown & Williamson*, 529 U.S. at 160, *W. Va. v. EPA*, 142 S. Ct. at 2609.

## COUNT II
### The Agencies do not have authority to mandate $CO_2$ emissions standards for the States.

141.    The Plaintiff States incorporate by reference the allegations in each of the foregoing paragraphs as if fully stated herein in their entirety.

142.    Both the operative statute and the Constitution prohibit the Final Rule's mandate to the States.

143.    It is clear that Congress did not intend to confer power on the Agencies to mandate that States set targets for $CO_2$ emissions. And the mandate of the Final

Rule requiring States to set declining emissions targets contravenes several statutory provisions and violates the principles of federalism, which those statutes sought to protect.

144.   Congress envisioned a role for the states with respect to the NHPP. By law, States must "develop a risk-based asset management plan . . . to improve or preserve the condition of the assets and performance of the [NHS]." 23 U.S.C. § 119(e)(1). The plan needs to "include strategies . . . that would make progress toward achievement of the *State targets* for asset condition and performance of the [NHS] in accordance with section 150(d) and supporting the progress toward the achievement of the national goals identified in section 150(b)." 23 U.S.C. § 119(e)(2) (emphasis added).

145.   According to 23 U.S.C. § 150, it is the States that set the performance targets. 23 U.S.C. § 150(d) ("[E]ach State shall set performance targets."). The Agencies' role is only to certify the States' plans. *See* 23 U.S.C. § 119(e)(6).

146.   With the Final Rule, the Agencies are forcing States to implement the President's controversial climate change policy by requiring them to "establish declining targets for reducing $CO_2$ emissions generated by on-road mobile sources . . . . [and] report on their progress." Final Rule at 85366. In effect, the Agencies are attempting to compel the States to be foot soldiers in service to President Biden's climate change agenda, notwithstanding their own sovereign interests and policies, and Congress's express enactment. This approach goes far beyond even the Obama–Biden administration's GHG rule (2017 Rule) where FHWA wrote: "The FHWA

believes that State DOTs and MPOs have the discretion to establish their targets. The MAP-21 does not provide FHWA the authority to approve or reject State DOT or MPO established targets." 2017 Rule at 5989.

147. Regulatory action cannot be used in this manner. Just because the President believes that reducing on-road $CO_2$ emissions is key to addressing climate change, *see* Final Rule at 85369 ("[T]he establishment of declining targets is vital given the urgency of the climate crisis."), does not mean the Agencies can compel the States to administer a federal administrative regulatory program absent statutory authority.

148. The newly enacted IIJA did not change the Agency's statutory authority to regulate. As made explicit in a comment to the Proposed Rule by a group of U.S. Senators, the "IIJA established new programs to *incentivize* and *reward* state DOTs and MPOs for implementing emissions reduction strategies."[70] Indeed, according to Senate Minority Leader Mitch McConnell and Ranking Member of the Senate Committee on Environment and Public Works Shelley Moore Capito, "[n]othing in the IIJA provides FHWA with the authority to dictate how states should use their federal formula funding."[71]

---

[70] Letter in Response to FHWA Proposed Rule by Republican Senators (July 28, 2022), *available at* https://www.regulations.gov/comment/FHWA-2021-0004-0007 (emphases added); *see* IIJA at §§ 50201-222.

[71] Letter from Senator McConnell and Senator Capito to State Governors (Feb. 9, 2022), *available at* www.epw.senate.gov/public/_cache/files/8/c/8c3b1b65-550b-493b-b6cd-33b108e53eac/B44AC4860614C4E3FD4712AAB8652E9C.2022-02-07-general-iija-governors-letter.pdf.

149.    The Agencies are attempting to impose what Congress decided not to impose. Even the version of the IIJA that was initially passed by the House did not extend the Agencies' authority as broadly as they now claim. The House version had a section devoted to carbon pollution reduction, in which it made funds available for States to set emissions goals and allowed the Secretary to shift federal funding for the fifteen states that performed the worst in meeting their goals.[72] In contrast, the enacted and codified version of the IIJA did not require the Secretary to evaluate the progress of the States in meeting emissions goals or condition funding on meeting any such goals. IIJA at § 11403.

150.    The Constitution is also clear that action by the States cannot be mandated through federal action like the Final Rule.

151.    "The Federal Government may not compel the States to enact or administer a federal regulatory program." *New York v. United States*, 505 U.S. 144, 188 (1992). "[T]he Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *Id.* at 187.

---

[72]    H.R. 3684, 117th Congress (engrossed in House Jul. 1, 2021), at § 1213, *available at* https://www.congress.gov/bill/117th-congress/house-bill/3684/text/eh [hereinafter "House Version"]; *see also* Michael Laris, *Infrastructure Proposal Creates a Program to Cut Emissions. Critics Say It's Missing Major Pieces*, THE WASHINGTON POST (Aug. 3, 2021), https://www.washingtonpost.com/transportation/2021/08/03/carbon-emissions-reduction-infrastructure/.

152.   Even if Congress believed the Final Rule was the best means of reducing $CO_2$ in order to address climate change, the States could not be directed to implement the policy choices of the federal government.[73] *See Printz v. United States*, 521 U.S. 898, 924 (1997).

153.   The Agencies recognize they lack authority to mandate the States meet certain targets. In the Proposed Rule, they claimed the GHG measure did "not mandate the level of the targets." Proposed Rule at 42401. And in the Final Rule, the Agencies said they are "not requiring that declining targets align to the Administration's net-zero targets as outlined in the national policy established under E.O. 14008." Final Rule at 85374.

154.   Yet, contrary to their claim and despite the changes to the language used, the Final Rule is still mandating States support and aid in the Administration's goal of reaching net-zero by 2050 because, under the Final Rule, States still have to set *declining* targets. *See* Final Rule at 85364 ("State DOTs and MPOs have the flexibility to set targets that work for their respective climate change policies and other policy priorities, so long as they are declining."); *id*. at 85380 ("The requirement for State DOTs and MPOs to establish declining targets for tailpipe $CO_2$ emissions on the NHS is vital given the urgency of the climate crisis. Declining targets will help . . . make Federal infrastructure investment decisions that reduce climate pollution, a principle set forth in E.O. 14008.").

---

[73]   The Constitution permits the Federal Government to hold out incentives to the States to encourage them to adopt a suggested regulatory scheme, *see, e.g., South Dakota v. Dole*, 483 U.S. 203 (1987), but the Rule would "require" action by the States, *see* Proposed Rule at 42402, 42413; Final Rule at 85364.

155.    The language used by the Agencies is mandatory. *See* Final Rule at 85364 ("The GHG measure requires State DOTs and MPOs that have NHS mileage within their . . . boundaries . . . to establish declining targets for reducing $CO_2$ emissions generated by on-road mobile sources."); *id*. at 85380. And the way an agency talks about the rule matters. *See W. Va. v. EPA*, 142 S. Ct. at 2611–12 (finding the EPA was asserting an unprecedented and overly broad power based on how the EPA described the rule). The Agencies cannot expect the States or this Court to treat as optional what they talk about as requirements.

156.    Because the Final Rule does not permit the States to choose what target to set (i.e., they are not able to set targets that maintain current $CO_2$ emissions levels rather than declining targets), it violates 23 U.S.C. § 150(d), which clearly says "each State shall set performance targets." The Agencies are infringing on the role Congress clearly envisioned for the States.

## COUNT III
### The Final Rule violates the Major Questions Doctrine.

157.    The Plaintiff States incorporate by reference the allegations in each of the foregoing paragraphs as if fully stated herein in their entirety.

158.    Congress did not authorize the Agencies to address climate change.

159.    Under the major questions doctrine, an agency's claim of authority must be clearly supported by statute before an agency can assert "'unheralded' regulatory power over a 'significant portion of the American economy.'" *W. Va. v. EPA*, 142 S. Ct. at 2608 (citation omitted). The Supreme Court has accordingly rejected agencies' claims of regulatory authority when the underlying claim of authority concerns an

52

issue of "vast 'economic and political significance,'" unless Congress has clearly spoken to empower the agency. *See Util. Air. Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014).

160.    The Final Rule, which mandates every state, the District of Columbia, and Puerto Rico to reduce on-road $CO_2$ emissions, results in federal regulation of a vast portion of the American economy.

161.    Studies have identified several "drastic changes" that would be required for the U.S. to achieve net-zero by 2050, including having 50% of all new cars sold after 2030 be battery-powered, switching over one quarter of homes from natural gas or oil heats to electric heat pumps, and shutting down "virtually all of the 200 remaining coal-burning power plants" by 2030.[74]

162.    Even without the Proposed Rule's language mandating States set their declining targets to achieve net-zero emissions by 2050, that is clearly the Agencies' goal. *See* Final Rule at 85365.

163.    And, regardless, requiring declining targets for all States will still affect a vast portion of the American economy. States will be forced to make choices about projects, contracts, and regulations in order to make and meet the declining targets. All of these choices can impact a State's economy, which in turn affects the nation's economy.

---

[74]    *See e.g.*, Brad Plumer, *To Cut Emissions to Zero, U.S. Needs to Make Big Changes in Next 10 Years*, THE NEW YORK TIMES (Dec. 15, 2020), https://www.nytimes.com/2020/12/15/climate/america-next-decade-climate.html.

164. The Final Rule will result in a major change in the States' selection of transportation projects.

165. Congress has delineated specific purposes for the NHPP and specified what constitutes an eligible facility and project. *See* 23 U.S.C. § 119.

166. Prior to the Final Rule, funds were distributed to the States who then selected projects on which to use those funds. The Final Rule, however, effectively requires that the States select projects that will help the State achieve a "declining target" for $CO_2$ emissions—or face potential penalties.[75] *See* Final Rule at 85368–69 (explaining that the GHG measure "does not force investments in specific projects," but "FHWA has determined that the targets for the GHG measure should show a reduction in $CO_2$ emissions").

167. The Agencies' economic assessment states, "it is not possible to conclude with any degree of certainty whether and how the GHG measure might cause State DOTs and MPOs to make transportation investment and operations decisions that they otherwise would not have made."[76] *Id.* at 6.

168. However, later on, the Economic Assessment acknowledges that "the rule may result in some offsetting loss of benefits from investment projects that would no longer be pursued, if funds are shifted towards other projects as a result of the rule." *Id.* at 29.

---

[75] While the Final Rule does not propose penalty authority or levels, both the Notice of Proposed Rulemaking and the Economic Assessment for the proposed rule volunteered that FHWA has penalty authority elsewhere that could be applied. *See* Proposed Rule at 42415, n.39; Economic Assessment, *supra* note 60 at 9.

[76] Economic Assessment, *supra* note 60 at 6.

54

169.    In reality, the Final Rule means the States will have to select projects based on the policy objectives of the President. The Final Rule says it "does not force investments in specific projects," but in the same paragraph says, "FHWA has determined that the targets for the GHG measure should show a reduction in $CO_2$ emissions," which will help achieve the "principle set forth in E.O. 14008"—that is, the principle of responding to the perceived climate crisis by achieving net-zero emissions by 2050. *See* Final Rule at 85368–69; Executive Order 14008, section 101. Not only is this restrained project selection unconstitutional under federalism principles, *supra* Count II, but also as an unauthorized assertion of unheralded regulatory authority over the economies of all of the States.

170.    The Defendants are fully aware of and acknowledge the magnitude of their proposed policy to address $CO_2$ emissions. In the joint press release issued when the Agencies finalized the rule, Defendant Administrator Bhatt said, "Transportation is the leading source of greenhouse gas emissions in the U.S. . . . . We don't expect state DOTs and MPOs to solve a problem this large on their own."[77]

171.    Congress has not clearly spoken to empower the Agencies to assert such unheralded regulatory authority.

172.    In fact, it is clear that Congress has *not* empowered the Agencies to act in this manner. A comparison of the House version[78] and the final enacted version of

---

[77]    *Biden-Harris Administration Finalizes Greenhouse Gas Emissions Reduction Tool, Moves Climate Change Performance Measure Forward*, U.S. DEPARTMENT OF TRANSPORTATION FEDERAL HIGHWAY ADMINISTRATION (Nov. 22, 2023), https://highways.dot.gov/newsroom/biden-harris-administration-finalizes-greenhouse-gas-emissions-reduction-tool-moves.

[78]    H.R. 3684, 117th Congress (engrossed in House Jul. 1, 2021), at § 1213, *available at* https://www.congress.gov/bill/117th-congress/house-bill/3684/text/eh [hereinafter "House Version"].

the IIJA demonstrates Congress decided to not give the Agencies expanded authority to address climate change.

173.    In the House version, the bill called for 23 U.S.C. § 119(d) to be amended by striking "or freight movement on the National Highway System" and inserting "freight movement, environmental sustainability, transportation system access, or combating climate change." House Version at § 1201. The final version made no such change. IIJA at § 11105.

174.    Likewise, there were a number of other places where the House version added language to focus on climate change, but that language was not included in the enacted version of the IIJA. *See, e.g.*, House Version at § 1202 (amending 23 U.S.C. § 135(f) to add a climate change and resilience section requiring the transportation planning process to "assess strategies to reduce the climate change impacts of the surface transportation system and conduct a vulnerability assessment to identify opportunities to enhance the resilience of the surface transportation system and ensure the efficient use of Federal resources"); *see also id.* at § 1201 (amending 23 U.S.C. § 119(e) by striking "analysis" and inserting "analyses, both of which shall take into consideration climate change adaptation and resilience"). All of these indicate that the language in the statute as enacted does not authorize the Agencies to address climate change.

175.    Indeed, Congress has not given authority to any agency to address climate change writ large in any capacity it wishes. While Congress has given authority to NHTSA and EPA to address some issues relating to climate change, that

authority is not unlimited and is clearly tethered to Congressional authorization. *See W. Va. v. EPA,* 142 S. Ct. at 2609. NHTSA and EPA have statutory authority only to reduce emissions from new vehicles. *See* 42 U.S.C. § 7521. That is a stark contrast to the Final Rule, which requires States to contort transportation investment decisions to reduce $CO_2$ emissions. Even if NHTSA and EPA had authority to require States to set declining targets for on-road $CO_2$ emissions, it would not mean U.S. DOT and FHWA had authority. Congress must clearly delegate the authority to U.S. DOT and FHWA if Congress wants them to address the extraordinary issue of climate change by regulating on-road $CO_2$ emissions.

176.   How (or whether) to address on-road $CO_2$ emissions is an issue of vast economic and political significance. Congress has not given the Agencies authority to regulate it.

## COUNT IV
### The Final Rule is arbitrary and capricious in violation of the Administrative Procedure Act.

177.   The Plaintiff States incorporate by reference the allegations in each of the foregoing paragraphs as if fully stated herein in their entirety.

178.   Under the Administrative Procedure Act, agency action cannot be arbitrary or capricious. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). This means that, *inter alia*, the agency cannot rely on "factors which Congress has not intended it to consider," and the agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the*

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The Agencies have violated both of these principles.

179.    By relying on climate-change factors, the Agencies have proposed an arbitrary action. Congress has not authorized them to consider $CO_2$ emissions, much less develop a rule to reduce them. *Supra* Count III. The Agencies cannot simply say they "ha[ve] reexamined th[e] determination from the 2018 repeal final rule" to assert "FHWA has the authority." Final Rule at 85374. The lack of authority for the subject of the Rule makes it arbitrary.

180.    Even if the Final Rule was not *per se* arbitrary, the Agencies have failed to articulate a satisfactory explanation for why they are imposing it on the States.

181.    Agencies have leeway to exercise expert discretion, but when exercising it, they must justify the choices they make by providing the basis for exercising their expert discretion. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167 (1962). And while "[a]n agency's view of what is in the public interest may change . . . [,] an agency changing its course must supply a reasoned analysis[.]" *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970); *see also Burlington*, 371 U.S. at 167 (noting that if an agency is not required to provide the reasoned analysis, it "can become a monster which rules with no practical limits on its discretion") (internal citation omitted).

182.    The Agencies said they are imposing a new version of the once-repealed GHG measure because they reconsidered the arguments for the 2018 repeal and found them lacking. Final Rule at 85366. Specifically, they are imposing the GHG

measure "[i]n light of the Agency's policy emphasis on using its available authorities to confront worsening climate change—as well as the new facts identified in reports issued between 2018 and 2021 that expand our knowledge of the severe consequences of climate change." Proposed Rule at 42405; *see also* Final Rule at 85369 (adopting in full the analysis in the Proposed Rule justifying the reconsideration). Accordingly, "FHWA reconsidered its legal authority, reexamined the assumptions regarding potential costs and potential duplication that underlay the repeal of the 2017 measure, and propose[d] adopting a GHG performance measure." Proposed Rule at 42405.

183.   The Agencies do not provide a sufficiently reasoned analysis for imposing the Final Rule. First, even according to the descriptions given by the Agencies, the new reports they identified are not specific to on-road $CO_2$ emissions; they simply address greenhouse gases generally. *See id*. The Agencies' summarized the IPCC Sixth Assessment Report from 2021 as saying human activities have increased atmospheric GHG emissions, which have raised the average surface temperature, and there may be "evidence linking human production of GHG emissions to extreme events such as heatwaves, heavy precipitation, droughts, and hurricanes." *Id*. The 2018 reports discuss assertions that limiting global warming "would likely require a decrease in global net anthropogenic $CO_2$ emissions[.]" *Id*. These general climate change reports are not sufficient justification for why the Agencies need to mandate declining on-road $CO_2$ emissions targets for all of the States.

184.    Second, the reexamination of the assumptions regarding potential costs and duplication of efforts is based on a difference in policy, not technical expertise. The Agencies reject the earlier conclusion that it "was not possible to predict, with any reasonable degree of certainty, the extent to which the influence effects of the GHG measure might result in actual changes in emissions levels" and say they now "anticipate[] that this proposed rule would result in substantial benefits that are neither speculative nor uncertain." *Id*. at 42410. Yet, in the *same paragraph*, they say the "benefits are not easily quantifiable." *Id*.; *see also id*. at 42404 ("The [regulatory impact analysis] discusses anticipated benefits of the rule qualitatively; they are not quantified because they are difficult to forecast and monetize."). The Agencies' ability to predict did not change, the Administration's policy goals did.

185.    In the Proposed Rule, the Agencies said the "GHG measure aligns with the national goal of reducing $CO_2$ emissions 50 to 52 percent below 2005 levels by 2030 in support of the Paris Agreement." *Id*. at 42411. This "national policy" that supports the Paris Agreement is just part of an Executive policy; the Senate has not given its advice and consent. Further, these are political choices, not exercises of technical expertise and discretion or legislative enactments. The numerous references to how the proposed GHG measure "aligns" with the Executive Orders establishing the net-zero targets demonstrate the Agencies are fully aware they are relying on Executive policy wishes. *Id*. at 42401, 42402–42403, 42406; Final Rule at 85365.

186.    The failure to supply a reasoned analysis that provides a basis for the Agencies exercising technical discretion makes the Final Rule arbitrary and capricious.

## COUNT V
### The Final Rule violates the Spending Clause.

187.    The Plaintiff States incorporate by reference the allegations in each of the foregoing paragraphs as if fully stated herein in their entirety.

188.    Because all States receive Federal highway formula funds and the Final Rule will, in effect, restrict the ways States use those funds, the Final Rule must comply with the constitutional limits on the Spending Clause.

189.    "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17)).

190.    Therefore, "Congress must provide 'clear notice' of the obligations a spending law entails." *Kentucky v. Yellen*, 54 F.4th 325, 348 (6th Cir. 2022) (quoting *Pennhurst* 451 U.S. at 25).

191.    And when an agency purports to act relative to a spending law, courts have to determine whether they (or the States) "must accept as binding an agency regulation establishing an otherwise-uncertain spending-law condition." *Yellen*, 54

61

F.4th at 353. To do so, courts impose a "clear-statement rule" on agency action implementing Spending Clause legislation. *See id.* at 347–48. Under this clear-statement rule, "Congress *itself* must have spoken with a 'clear voice.'" *Id.* at 354 (quoting *Pennhurst*, 451 U.S. at 17).

192.   Here, 23 U.S.C. § 150(c)(3) comes nowhere near being a clear statement that would put States on notice that the Agencies could use it to mandate States set declining on-road $CO_2$ emissions targets. The Final Rule is thus *ultra vires*.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiff States respectfully ask this Court to:

1. Declare the Final Rule is unlawful because it was promulgated in excess of the Agencies' statutory authority, violates the Constitution by usurping the role of the Legislature and of the States, and is arbitrary and capricious;

2. Vacate and set aside the Final Rule in its entirety;

3. Issue preliminary and permanent injunctive relief prohibiting the Agencies from implementing, applying, enforcing, or otherwise proceeding on the basis of the Final Rule;

4. Award the Plaintiffs reasonable costs and fees, including attorney's fees, pursuant to any applicable statute or authority;

5. Grant the Plaintiffs such additional relief that the Court deems appropriate.

Respectfully Submitted,

**DANIEL CAMERON**
  Attorney General

/s/ Aaron J. Silletto
VICTOR B. MADDOX
  Deputy Attorney General
AARON J. SILLETTO
  Assistant Attorney General
LINDSEY R. KEISER
  Assistant Attorney General
**Kentucky Office of the Attorney General**
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
victor.maddox@ky.gov
aaron.silletto@ky.gov
lindsey.keiser@ky.gov

*Counsel for the Commonwealth of Kentucky*

**MARTY J. JACKLEY**
  Attorney General

/s/ Karla L. Engle
KARLA L. ENGLE*
  Special Assistant Attorney General
**South Dakota Department of Transportation**
700 East Broadway Ave.
Pierre, South Dakota 57501
(605) 773-4396
Karla.engle@state.sd.us

*Counsel for Plaintiff State of South Dakota*

**STEVE MARSHALL**
  Attorney General

/s/ Edmund G. LaCour, Jr.
EDMUND G. LACOUR, JR.*
  Solicitor General
**Office of the Attorney General State of Alabama**
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

**TREG TAYLOR**
  Attorney General

/s/ Sean Lynch
SEAN LYNCH*
  Chief Assistant Attorney General
**Alaska Department of Law**
P.O. Box 110300
Juneau, Alaska 99811-0300
(907) 465-3600
sean.lynch@alaska.gov

*Counsel for Plaintiff State of Alaska*

63

**TIM GRIFFIN**
  Attorney General

/s/ Nicholas J. Bronni
NICHOLAS J. BRONNI*
  Solicitor General
**Office of the Arkansas Attorney General**
323 Center St., Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

**RAÚL R. LABRADOR**
  Attorney General

/s/ James E.M. Craig
JOSHUA N. TURNER
  Acting Solicitor General
JAMES E.M. CRAIG*
  Division Chief, Civil Litigation and
Constitutional Defense
**Office of the Idaho Attorney General**
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
James.Craig@ag.idaho.gov

*Counsel for State of Idaho*

**ASHLEY MOODY**
  Attorney General

/s/ Natalie P. Christmas
NATALIE P. CHRISTMAS*
  Counselor to the Attorney General
**Office of the Florida Attorney General**
PL-01 the Capitol
Tallahassee, Florida 32399
(850) 414-3300
natalie.christmas@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

**THEODORE E. ROKITA**
  Attorney General

/s/ James A. Barta
JAMES A. BARTA*
  Solicitor General
**Indiana Attorney General's Office**
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

**BRENNA BIRD**
   Attorney General

/s/ Eric H. Wessan
ERIC H. WESSAN*
   Solicitor General
**Office of the Iowa Attorney General**
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*


**LYNN FITCH**
   Attorney General

/s/ Justin L. Matheny
JUSTIN L. MATHENY*
   Deputy Solicitor General
**Mississippi Attorney General's Office**
P.O. Box 220
Jackson, Mississippi 39205
601-359-3680
Justin.Matheny@ago.ms.gov

*Counsel for State of Mississippi*


**MICHAEL T. HILGERS**
   Attorney General

/s/ Zachary B. Pohlman
ZACHARY B. POHLMAN*
   Assistant Solicitor General
**Office of the Nebraska Attorney General**
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
zachary.pohlman@nebraska.gov

*Counsel for Plaintiff State of Nebraska*


**KRIS W. KOBACH**
   Attorney General

/s/ Abhishek S. Kambli
ABHISHEK S. KAMBLI*
   Deputy Attorney General
**Office of Kansas Attorney General**
120 S.W. 10th Ave., 2nd Floor
Topeka, Kansas 66612
(785) 296-6109
Abhishek.kambli@ag.ks.gov

*Counsel for Plaintiff State of Kansas*


**AUSTIN KNUDSEN**
   Attorney General

/s/ Christian B. Corrigan
CHRISTIAN B. CORRIGAN*
   Solicitor General
**Montana Department of Justice**
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Plaintiff State of Montana*


**DREW H. WRIGLEY**
   Attorney General

/s/ Philip Axt
PHILIP AXT*
   Solicitor General
**North Dakota Attorney General's Office**
600 E Boulevard Avenue, Dept. 125
Bismarck, North Dakota 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for Plaintiff State of North Dakota*

**DAVE YOST**
  Attorney General

/s/ T. Elliot Gaiser
T. ELLIOT GAISER*
  Solicitor General
MATHURA J. SRIDHARAN*
  Deputy Solicitor General
**Office of the Ohio Attorney General**
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*

**GENTNER DRUMMOND**
  Attorney General

/s/ Garry M. Gaskins, II
GARRY M. GASKINS, II*
  Solicitor General
**Office of Oklahoma Attorney General**
313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

**ALAN WILSON**
  Attorney General

/s/ J. Emory Smith, Jr.
J. EMORY SMITH, JR.*
  Deputy Solicitor General
**Office of the South Carolina Attorney General**
P.O. Box 11549
Columbia, South Carolina 29211
(803) 734-3642
esmith@scag.gov

*Counsel for Plaintiff State of South Carolina*

**SEAN D. REYES**
  Attorney General

/s/ Christopher A. Bates
CHRISTOPHER A. BATES*
  Deputy Solicitor General
**Utah Office of the Attorney General**
350 N. State Street, Suite 230
Salt Lake City, Utah 84114
(801) 538-9600
chrisbates@agutah.gov

*Counsel for Plaintiff State of Utah*

**JASON S. MIYARES**
  Attorney General

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON*
  Solicitor General
KEVIN M. GALLAGHER*
  Deputy Solicitor General
**Virginia Attorney General's Office**
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

**BRIDGET HILL**
  Attorney General

/s/ Ryan Schelhaas
RYAN SCHELHAAS*
  Chief Deputy Attorney General
**Wyoming Attorney General's Office**
109 State Capitol
Cheyenne, Wyoming 82009
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

**PATRICK MORRISEY**
  Attorney General

/s/ Michael R. Williams
LINDSAY SEE
  Solicitor General
MICHAEL R. WILLIAMS*
  Principal Deputy Solicitor General
**Office of the West Virginia Attorney General**
State Capitol, Bldg 1, Room E-26
Charleston, West Virginia 25305
Phone: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

    **Pro hac vice* application forthcoming

## CERTIFICATE OF SERVICE

    I certify that on December 21, 2023, the above document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record.

        /s/ Aaron J. Silletto
        *Counsel for the Commonwealth of Kentucky*