**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION**

COMMONWEALTH OF KENTUCKY,
*et al.*,

                Plaintiffs,

      v.

FEDERAL HIGHWAY
ADMINISTRATION, *et al.*,

                Defendants.

Case No. 5:23-cv-00162-BJB-LLK

**<u>DEFENDANTS' COMBINED BRIEF IN SUPPORT OF PARTIAL MOTION TO
DISMISS UNDER RULE 12(b)(1) AND MOTION TO DISMISS UNDER
RULE 12(b)(3), OR IN THE ALTERNATIVE, CROSS-MOTION FOR SUMMARY
JUDGMENT, AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................4

STANDARD OF REVIEW ....................................................................................8

ARGUMENT ..........................................................................................................9

I.      The Court Should Dismiss the Case for Lack of Venue Because Kentucky
        Has Not Established that It Has Standing. ................................................9

        A.      Kentucky Has Not Met Its Burden of Establishing Standing......................9

        B.      Because Kentucky Is Not a Proper Party, this Court Lacks Venue............12

II.     The Final Rule Is an Appropriate Exercise of the Agency's Statutory
        Authority. .................................................................................................14

III.    The Final Rule Is Not Arbitrary and Capricious. ....................................23

        A.      The Final Rule Is Permissible Under the Law ...............................23

        B.      FHWA Provided a Reasoned Explanation for the Final Rule ...................24

        C.      FHWA Considered the Costs to States........................................27

IV.     The Final Rule Does Not Violate the Spending Clause. ...........................29

V.      Any Relief Should Be Limited to the Plaintiff States that Are Proper
        Parties. .....................................................................................................31

CONCLUSION .....................................................................................................33

## TABLE OF AUTHORITIES

**CASES**

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967) ................................................................32

*Am. Petrol. Inst. v. EPA*,
  906 F.2d 729 (D.C. Cir. 1990) ...............................................24

*Am. Telecom Co. v. Republic of Lebanon*,
  501 F.3d 534 (6th Cir. 2007) ...................................................8

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ..................................................31

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ................................................................29

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ..................................................................26

*Berry v. Esper*,
  322 F. Supp. 3d 88 (D.D.C. 2018) ...........................................3

*Blue Ocean Inst. v. Gutierrez*,
  585 F. Supp. 2d 36 (D.D.C. 2008) ...........................................9

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ..................................................32

*California v. Texas*,
  593 U.S. 659 (2021) ................................................................12

*Camp v. Pitts*,
  411 U.S. 138 (1973) ..................................................................9

*Chance v. Mahoning Cnty.*,
  105 F. App'x 644 (6th Cir. 2004) .............................................3

*Citizens Coal Council v. EPA*,
  447 F.3d 879 (6th Cir. 2006) ..................................................26

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ..............................................................9, 10

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
    726 F.3d 767 (6th Cir. 2013) ............................................................................31

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ......................................................................................30

*Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.,*
    576 F. App'x 477 (6th Cir. 2014)....................................................................25

*COMPTEL v. FCC,*
    978 F.3d 1325 (D.C. Cir. 2020).....................................................................24

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
    596 U.S. 212 (2022) ......................................................................................29

*Cunningham v. Cornell Univ.,*
    86 F.4th 961 (2d Cir. 2023) ..........................................................................15

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ......................................................................................12

*Delta T Corp. v. Ritchie Eng'g Co.,*
    No. 5:11-cv-208, 2011 WL 13234316 (E.D. Ky. Nov. 18, 2011) .........................32

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ...........................................................................25, 28

*Dep't of Homeland Sec. v. New York,*
    140 S. Ct. 599 (2020) ............................................................................31, 32

*Enriquez-Perdomo v. Newman,*
    54 F.4th 855 (6th Cir. 2022)..........................................................................11

*Fair Elections Ohio v. Husted,*
    770 F.3d 456 (6th Cir. 2014) ...................................................................10, 11

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ......................................................................................24

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .........................................................................23, 26, 28

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ........................................................................................9

*Ga. Republican Party v. SEC,*
    888 F.3d 1198 (11th Cir. 2018) ...................................................................13

*Gibson v. Mayor & Council of City of Wilmington,*
    355 F.3d 215 (3d Cir. 2004) ........................................................................3

*Gill v. Whitford,*
    585 U.S. 48 (2018) ...................................................................................31

*Goldin v. FDIC,*
    985 F.2d 261 (6th Cir. 1993) ......................................................................9

*Greenpeace Action v. Franklin,*
    14 F.3d 1324 (9th Cir. 1992) ....................................................................27

*Gulf Ins. Co. v. Glasbrenner,*
    417 F.3d 353 (2d Cir. 2005) ......................................................................8

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ................................................................................12

*Hosseini v. Nielsen,*
    911 F.3d 366 (6th Cir. 2018) ....................................................................23

*Inst. of Certified Pracs., Inc. v. Bentsen,*
    874 F. Supp. 1370 (N.D. Ga. 1994) ...........................................................13

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n,*
    720 F.3d 370 (D.C. Cir. 2013) .............................................................24, 25

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) ....................................................................22

*Ky. Coal Ass'n v. Tenn. Valley Auth.,*
    804 F.3d 799 (6th Cir. 2015) ....................................................................23

*Lewis v. Casey,*
    518 U.S. 343 (1996) ................................................................................12

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    140 S. Ct. 2367 (2020) ......................................................................14, 23

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) ....................................................................31

*Lujan v. Defs. of Wildlife,*
　　504 U.S. 555 (1992) ....................................................................................10, 11

*Madsen v. Women's Health Ctr., Inc.,*
　　512 U.S. 753 (1994) ................................................................................................31

*Martensen v. Koch,*
　　942 F. Supp. 2d 983 (N.D. Cal. 2013) ...............................................................8

*McKay v. Federspiel,*
　　823 F.3d 862 (6th Cir. 2016) ...............................................................................8

*Miles v. WTMX Radio,*
　　15 F. App'x 213 (6th Cir. 2001) ....................................................................13, 14

*Miller v. Albright,*
　　523 U.S. 420 (1998) ..............................................................................................13

*Miller v. Lifestyle Creations, Inc.,*
　　993 F.2d 883 (9th Cir. 1993) .................................................................................8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
　　463 U.S. 29 (1983) .................................................................................................23

*N.C. Fisheries Ass'n v. Gutierrez,*
　　518 F. Supp. 2d 62 (D.D.C. 2007) ....................................................................28

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
　　538 U.S. 109 (2018) .............................................................................................14

*Nat'l Fed'n of Indep. Business v. Sebelius,*
　　567 U.S. 519 (2012) .............................................................................................29

*Pennhurst State Sch. & Hosp. v. Halderman,*
　　451 U.S. 1 (1981) ..................................................................................................29

*Pension Ben. Guar. Corp. v. LTV Corp.,*
　　496 U.S. 633 (1990) .............................................................................................19

*Pinnacle Armor, Inc. v. United States,*
　　923 F. Supp. 2d 1226 (E.D. Cal. 2013) ...............................................................3

*Powers v. Ohio,*
　　499 U.S. 400 (1991) .............................................................................................12

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014) ................................................................26

*Smirnov v. Clinton,*
    806 F. Supp. 2d 1 (D.D.C. 2011), *aff'd,* 487 F. App'x 582 (D.C. Cir. 2012) .......................3

*Texas v. EPA,*
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ....................................................9

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ..............................................................31, 32

*United States v. Schopp,*
    938 F.3d 1053 (9th Cir. 2019) ...........................................................15

*United States v. Texas,*
    599 U.S. 670 (2023) ..............................................................33

*United States v. Wallington,*
    889 F.2d 573 (5th Cir. 1989) ...........................................................15

*United States v. Wise,*
    370 U.S. 405 (1962) ..............................................................19

*Universal Life Church Monastery Storehouse v. Nabors,*
    35 F.4th 1021 (6th Cir. 2022) ...........................................................12

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ..............................................................20, 21, 22

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24, S. Atl. & Gulf Coast Dist. of the ILA, AFL-CIO,*
    751 F.2d 721 (5th Cir. 1985) ...........................................................32

*W. Virginia v. EPA,*
    597 U.S. 697 (2022) ..............................................................20, 22

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ..............................................................32

*Wheeler v. Hurdman,*
    825 F.2d 257 (10th Cir. 1987) ...........................................................8

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ..............................................................30

vi

**FEDERAL STATUTES**

5 U.S.C. § 706 ...................................................................................................9, 32

23 U.S.C. § 101 ......................................................................................................17

23 U.S.C. § 119 ......................................................................................................16

23 U.S.C. § 134 ...................................................................................................1, 17

23 U.S.C. § 135 ......................................................................................................17

23 U.S.C. § 145 ......................................................................................................22

23 U.S.C. § 150 .................................................................................................*passim*

28 U.S.C. § 1391 ..............................................................................................12, 13

28 U.S.C. § 1406 ................................................................................................8, 13

Infrastructure Investment and Jobs Act,
    Pub. L. No. 117-58, 135 Stat. 429 (2021)..........................................................19

**STATE STATUTES**

Ky. Const. § 91 ......................................................................................................11

**RULES**

Fed. R. Civ. P. 12...............................................................................................3, 13

Fed. R. Civ. P. 56...................................................................................................9

**REGULATIONS**

23 C.F.R. § 1.36.....................................................................................................30

23 C.F.R. § 470.107..................................................................................................1

23 C.F.R. § 490.101................................................................................................25

23 C.F.R. § 490.105................................................................................................25

23 C.F.R. § 490.109..................................................................................................7

23 C.F.R. § 490.507..................................................................................................7

National Performance Management Measures; Assessing Performance of the
  National Highway System, Freight Movement on the Interstate System, and
  Congestion Mitigation and Air Quality Improvement Program,
  82 Fed. Reg. 5,970 (Jan. 18, 2017) .......................................................................5

National Performance Management Measures; Assessing Performance of the
  National Highway System, Freight Movement on the Interstate System, and
  Congestion Mitigation and Air Quality Improvement Program,
  83 Fed. Reg. 24,920 (May 31, 2018) ......................................................................6

Protecting Public Health and the Environment and Restoring Science to Tackle
  the Climate Crisis,
  Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 20, 2021) ................................6

Tackling the Climate Crisis at Home and Abroad,
  Exec. Order No. 14,008, 86 Fed. Reg. 7,619 (Jan. 27, 2021) ................................6

National Performance Management Measures; Assessing Performance of
  the National Highway System, Greenhouse Gas Emissions Measure,
  87 Fed. Reg. 42,401 (July 15, 2022).......................................................................6

National Performance Management Measures; Assessing Performance of the
  National Highway System, Greenhouse Gas Emissions Measure,
  88 Fed. Reg. 85,364 (Dec. 7, 2023) .............................................................*passim*

## OTHER AUTHORITIES

14D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure
  § 3815 (4th ed.)....................................................................................................13

14D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure
  § 3827 (4th ed.)....................................................................................................14

INVEST in America Act, H.R. 3684, 117th Cong., § 1403 (2021) .......................................19

U.S. Dep't of Transp., Federal Highway Administration & Federal Transit
  Administration, *Status of the Nation's Highways, Bridges, and Transit* (24th ed. 2021),
  https://www.fhwa.dot.gov/policy/24cpr/pdf/24cpr.pdf............................................1

## INTRODUCTION

After conducting notice-and-comment rulemaking and pursuant to its statutory authority, the Federal Highway Administration ("FHWA") published a Final Rule requiring states and metropolitan planning organizations ("MPOs") to measure greenhouse gas ("GHG") emissions from on-road mobile sources on the National Highway System ("NHS")[1] within their jurisdiction and to set targets for reducing these emissions. *See* National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 88 Fed. Reg. 85,364 (Dec. 7, 2023) ("Final Rule") (reproduced at Administrative Record FHWA000001). The Final Rule is intended to provide state and local decisionmakers with nationally consistent and transparent information regarding GHG emissions to use when they select projects within their jurisdictions. The Final Rule requires states[2] to submit periodic reports to FHWA, but there are no penalties if a state fails to meet its target or fails to reduce GHG emissions.

Twenty-one Plaintiff States brought this lawsuit challenging the Final Rule as exceeding FHWA's statutory authority; arbitrary and capricious; and unconstitutional in

---

[1] The NHS consists of interconnected urban and rural principal arterials and highways (including toll facilities) which serve major population centers, international border crossings, ports, airports, public transportation facilities, other intermodal transportation facilities and other major travel destinations; meet national defense requirements; and serve interstate and interregional travel. All routes on the Interstate System are a part of the NHS. 23 CFR § 470.107(b)(1). The NHS consists of slightly over 5 percent of highway route miles in the United States but accounts for approximately 55 percent of vehicle miles travelled. *See* U.S. Dep't of Transp., Federal Highway Administration & Federal Transit Administration, *Status of the Nation's Highways, Bridges, and Transit*, at 1-8 (24th ed. 2021), https://www.fhwa.dot.gov/policy/24cpr/pdf/24cpr.pdf.

[2] Many of the Final Rule's terms apply to both states and MPOs. *See* 23 U.S.C. § 134(d) (requiring a state to designate an MPO to carry out transportation planning activities for each urbanized area with a population of more than 50,000 individuals). Because no MPO is a party to this case, this brief primarily focuses on the Final Rule's applicability to states.

violation of the Spending Clause. The Plaintiff States have moved for summary judgment on these grounds and seek an order "vacat[ing] and set[ting] aside in its entirety" the Final Rule. Pls.' Mot. for Summ. J., ECF No. 72; Proposed Order at 2, ECF No. 74-1. None of the Plaintiff States' claims is meritorious and could not support summary judgment in Plaintiffs' favor. But *this* Court should not even reach the merits of Plaintiffs' claims, which cannot overcome threshold deficiencies barring review here: because Kentucky has failed to demonstrate standing, this case should be dismissed or transferred for improper venue, or, in the alternative, summary judgment should be entered for Defendants.

Kentucky—along with several other Plaintiff States—has not met its burden of establishing standing. Although many of the Plaintiff States submitted declarations explaining the alleged harms to their states from the Final Rule, Kentucky submitted no such evidence. The Court therefore lacks jurisdiction over Kentucky as a party to this case. Because venue in this district is premised on Kentucky's status as a Plaintiff, venue is improper once Kentucky is dismissed. The Court should dismiss the case and allow the Plaintiff States with standing to refile in a different district.

On the merits, the Final Rule is not unlawful. First, FHWA has authority to establish measures for "performance" of the NHS, 23 U.S.C. § 150(c)(3), in furtherance of the "national goals" set forth in 23 U.S.C. § 150(b), which include "[e]nvironmental sustainability." In context, the best reading of the statute is that the term "performance" includes environmental performance, including GHG emissions, in furtherance of the goal of environmental sustainability. Thus, FHWA has clear statutory authority to issue the Final Rule.

Second, the Final Rule is not arbitrary and capricious. Contrary to the Plaintiff States' claims, the Final Rule is not impermissible under the statute, and FHWA provided a reasonable explanation for issuing the Final Rule. Also contrary to the Plaintiffs States' claims, FHWA considered the costs to the states of implementing the Final Rule, which

are generally limited to the costs of establishing targets, monitoring, and reporting emissions because the Final Rule does not require states to achieve their targets or take any other specific actions with respect to ongoing or planned transportation projects within their jurisdictions.

Third, the Final Rule is not an unconstitutional condition on federal funding that was not clearly expressed by Congress. The Final Rule imposes no consequences for a state's failure to meet emissions targets, so meeting those targets is not a condition on funding at all, and Plaintiffs have not demonstrated that their funding is likely in jeopardy for failure to set targets or submit reports.

For all of these reasons, should the Court reach the merits of Plaintiffs' claims, judgment should be entered in Defendants' favor.[3] And should the Court nonetheless determine that the Plaintiffs States are entitled to judgment, the scope of any relief

---

[3] At the January 31, 2024 hearing, the Court requested an explanation as to why Defendants intended to file a cross-motion for summary judgment, as opposed to requesting final judgment in Defendants' favor in response to Plaintiffs' motion for summary judgment. Defendants herein move to dismiss, contesting that this Court is a proper venue. *See* Fed. R. Civ. P. 12(h)(1) (dictating that an argument that a court is an improper venue is waived if not made in a motion under Rule 12). Defendants also cross-move, in the alternative, for summary judgment. "Normally, APA cases are resolved on cross-motions for summary judgment . . . ." *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1245 (E.D. Cal. 2013)); *see also Smirnov v. Clinton*, 806 F. Supp. 2d 1, 21 n.16 (D.D.C. 2011) ("[M]ost APA cases [are resolved] through the consideration of cross motions for summary judgment . . . ."), *aff'd*, 487 F. App'x 582 (D.C. Cir. 2012); *Berry v. Esper*, 322 F. Supp. 3d 88, 90 (D.D.C. 2018) ("Challenges to agency decisions under the APA are properly resolved on motions for summary judgment . . . ."). "[T]he district court may grant summary judgment *sua sponte*" only "if the losing party is put on notice beforehand that it must come forward with all of its evidence." *Chance v. Mahoning Cnty.*, 105 F. App'x 644, 649 (6th Cir. 2004). "[T]he *sua sponte* grant of summary judgment, without giving notice to the parties, is not the preferred method by which to dispose of claims." *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004). For this reason, and out of an abundance of caution, Defendants have filed a cross-motion for summary judgment.

awarded should give due consideration to Article III and the Administrative Procedure Act.

## BACKGROUND

The 2012 Moving Ahead for Progress in the 21st Century Act (MAP-21) and the 2015 Fixing America's Surface Transportation Act (FAST Act) enacted several changes to the Federal-aid highway program. These statutes established performance management requirements and tasked FHWA with implementing them. As Congress explained in 23 U.S.C. § 150(a), "[p]erformance management will transform the Federal-aid highway program and provide a means to the most efficient investment of Federal transportation funds by refocusing on national transportation goals, increasing the accountability and transparency of the Federal-aid highway program, and improving project decisionmaking through performance-based planning and programming."

The transportation goals of the Transportation Performance Management ("TPM") statutory framework, on which "[p]erformance management" will be "refocus[ed]," 23 U.S.C. § 150(a), are in turn set forth in 23 U.S.C. § 150(b). The statute declares that "[i]t is in the interest of the United States to focus the Federal-aid highway program on" seven "national goals," summarized as "(1) Safety," "(2) Infrastructure condition," "(3) Congestion reduction," "(4) System reliability," "(5) Freight movement and economic vitality," "(6) Environmental sustainability," and "(7) Reduced project delivery delays." *Id.* § 150(b). The statute instructs FHWA to "promulgate a rulemaking that establishes performance measures and standards" "[n]ot later than 18 months after the date of enactment of the MAP-21" and "in consultation with State departments of transportation" ("State DOTs"), "metropolitan planning organizations" ("MPOs"), "and other stakeholders." *Id.* § 150(c)(1). Such regulation should establish "measures for States to use to assess": "the condition of pavements on the Interstate system"; "the condition of pavements on the National Highway System (excluding the Interstate)"; "the condition of bridges on the National Highway System"; "the performance of the Interstate System";

4

"the performance of the National Highway System (excluding the Interstate System)"; "serious injuries and fatalities per vehicle mile traveled"; "the number of serious injuries and fatalities"; "traffic congestion"; "on-road mobile source emissions"; and "freight movement." *Id.* § 150(c)(3)(A)(ii), (4)–(6). After promulgation of a regulation, states must "set performance targets that reflect" these measures. *Id.* § 150(d)(1). Beginning four years after enactment of the MAP-21, States are required to submit biennial reports that describe, among other things, "the condition and performance of the National Highway System in the State" and "progress in achieving performance targets." *Id.* § 150(e).

Starting in 2016, FHWA issued several performance management rules pursuant to the requirement in 23 U.S.C. § 150(c)(1). The first two rules, known as "PM1" and "PM2," focused on safety and infrastructure (bridge and pavement conditions), respectively. 88 Fed. Reg. at 85,366 (describing the regulatory history). The third rule, known as "PM3," published January 18, 2017, established several further performance measures, including on-road mobile source GHG emissions. *See id.* (discussing National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 82 Fed. Reg. 5,970 (Jan. 18, 2017)). The PM3 rule recognized that emissions of GHG, such as carbon dioxide ("$CO_2$"), build up in Earth's atmosphere and result in increased average global temperatures over time. *Id.* PM3 also noted that on-road sources account for over 80% of GHG emissions from the United States transportation sector. *Id.* FHWA thus decided to establish a GHG emissions performance measure involving the percent change in $CO_2$ emissions from the reference year 2017 generated by on-road mobile sources on the National Highway System. *Id.*

In 2017, FHWA changed course and announced that it would repeal PM3's GHG measure. *See id.* On May 31, 2018, FHWA published a new rule ("the 2018 Rule") repealing the GHG measure, citing three main reasons: (1) reconsideration of the legal authority to issue a GHG measure; (2) the cost of the GHG measure in comparison to the

lack of demonstrated benefits; and (3) a potential duplication of information from other initiatives related to measuring $CO_2$ emissions. *See id.* (discussing National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 83 Fed. Reg. 24,920 (May 31, 2018)). The repeal took effect before any of the states' deadlines for target setting or reporting. *See id.*

In 2022, FHWA issued a Notice of Proposed Rulemaking ("NPRM") to establish a new GHG measure. *See id.* (discussing National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 87 Fed. Reg. 42,401 (July 15, 2022)). The NPRM proposed to require State DOTs and MPOs that have National Highway System mileage within their geographic boundaries to establish targets for reducing tailpipe $CO_2$ emissions from on-road mobile sources that align with the goal of net-zero emissions economy-wide by 2050. *See id.*; *see also* Tackling the Climate Crisis at Home and Abroad, Exec. Order No. 14,008, § 201, 86 Fed. Reg. 7,619, 7,622 (Jan. 27, 2021) (declaring a policy to "put the United States on a path to achieve net-zero emissions, economy-wide, by no later than 2050"); Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, Exec. Order No. 13,990, § 1, 86 Fed. Reg. 7,037 (January 20, 2021) (declaring a government-wide policy "to reduce greenhouse gas emissions"). Under the rule proposed in the NPRM, states would be required to establish two- and four-year statewide emissions reduction targets, and MPOs would be required to establish four-year emissions reduction targets, with each to report on its progress meeting the targets. 88 Fed. Reg. at 85,366–67; *see id.* at 85,371 (using 2022 as the reference year). On December 7, 2023, after providing notice and soliciting, receiving, and reviewing public comments, FHWA published the Final Rule. *See id.* at 85,367.

The Final Rule finalized the NPRM with some modifications. Most notably, the Final Rule clarifies that, while states must set declining targets for GHG emissions, those

targets do not need to demonstrate reductions toward net-zero emissions by 2050. *Id.* at 85,380. The Final Rule also clarifies the lack of consequences for a state's failure to meet its targets:

> There are no specific penalties for failing to achieve GHG targets. Rather, consistent with existing [National Highway Performance Program ("NHPP")] performance measures, if significant progress in not made for the target established for the GHG measure in 23 C.F.R. 490.507(b), the State DOT must document the actions it will take to achieve that target no later than in its next biennial report, but is encouraged to do so sooner. . . . The FHWA did not propose specific penalties for failure to achieve performance targets, and is not finalizing any such penalty. Failure to achieve significant progress for this measure, as defined in 23 C.F.R. 490.109, will also not trigger any penalties. State DOTs and MPOs that set a declining target but fail to achieve their targets can satisfy regulatory requirements by documenting the actions they will take to achieve that target in their next biennial report. The FHWA does not set or approve the State DOT's or MPO's targets.

*Id.* at 85,378. The goal of the Final Rule is to promote a reduction in GHG emissions by ensuring states have transparent information, rather than to mandate reductions. "The first step toward reducing GHG emissions involves inventorying and monitoring those emissions." *Id.* at 85,365. By providing updated data regarding mobile source emissions on the NHS, "the GHG measure has the potential to increase public awareness of GHG emissions trends, improve the transparency of transportation decisions, enhance decisionmaking at all levels of government, and support better informed planning choices to reduce GHG emissions or inform tradeoffs among competing policy choices." *Id.*

The Final Rule also explains FHWA's reconsideration of the rationales underlying the 2018 Rule and determination to depart from them. *Id.* at 85,369–70. The Final Rule explains that the 2018 Rule adopted a mistakenly narrow interpretation of 23 U.S.C. § 150(c) that overlooked one of that subsection's key provisions. *Id.* It also explains that the 2018 Rule misunderstood and thus overestimated the cost of a GHG measure to states

and MPOs, *id.* at 85,370, and that other programs that collect data on $CO_2$ emissions do not provide the specific information gained from the Final Rule, *i.e.*, emissions from on-road mobile sources on the NHS, *see id.* at 85,379.

The Final Rule requires states to establish initial GHG emissions targets and report them to FHWA by no later than February 1, 2024. *Id.* at 85,372. However, in this litigation and related litigation, *see Texas v. U.S. Dep't of Transp.*, No. 5:23-cv-00304-H (N.D. Tex.), FHWA agreed not to enforce the February 1, 2024 deadline until March 29, 2024, *see* Joint Status Report, ECF No. 60.

## STANDARD OF REVIEW

In response to a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing jurisdiction. *See Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). In order for the Court to have subject-matter jurisdiction over a challenge to agency action, the plaintiff must have standing to sue. *See, e.g., McKay v. Federspiel*, 823 F.3d 862, 866–67 (6th Cir. 2016). A court may examine materials outside the pleadings as it deems appropriate in order to resolve the question of its jurisdiction. *See Miller v. Lifestyle Creations, Inc.*, 993 F.2d 883 (9th Cir. 1993) (mem.) (citing *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).

The plaintiff also has the burden of proving that venue is proper in response to a motion to dismiss under Rule 12(b)(3). *See Martensen v. Koch*, 942 F. Supp. 2d 983, 996 (N.D. Cal. 2013); *see also Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (applying the "preponderance of the evidence" standard). A court may likewise consider materials outside the pleadings to determine whether venue is proper. *Martensen*, 942 F. Supp. 2d at 996. "If the court finds venue is improper, it has discretion to dismiss or to transfer venue to a proper court." *Id.*; *see* 28 U.S.C. § 1406(a).

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "In the context of a challenge under the [Administrative Procedure Act ("APA")], '[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Texas v. EPA*, 389 F. Supp. 3d 497, 503 (S.D. Tex. 2019) (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008)). When reviewing agency action under the APA, a court may "set aside agency action" when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he arbitrary and capricious standard is deferential toward agency decisions." *Goldin v. FDIC*, 985 F.2d 261, 263 (6th Cir. 1993).

In reviewing a final agency action under the APA, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "[T]he focal point for judicial review" of an administrative agency's action "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). A court must "apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (citation omitted); *see also id.* (explaining that a court's "factfinding capacity" is "typically unnecessary to judicial review" in an APA case).

## ARGUMENT

**I.   The Court Should Dismiss the Case for Lack of Venue Because Kentucky Has Not Established that It Has Standing.**

### A.   Kentucky Has Not Met Its Burden of Establishing Standing

The Court must dismiss Kentucky as a Plaintiff for lack of subject matter jurisdiction because Kentucky has not established that it has standing. "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City*

*of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983). One of the "landmarks" that differentiates a constitutional case or controversy from more abstract disputes "is the doctrine of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The first requirement of standing is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" *Id.* Second, "there must be a causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant and not the result of the independent action of some third party not before the court. *Id.* Third, it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court. *Id.* at 561.

These three elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Id.* Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* Here, where Plaintiff States seek summary judgment in their favor, they are required to tender evidence of an injury in fact caused by the Final Rule. *See, e.g., Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) ("[A]t summary judgment, plaintiffs must set forth 'specific facts'" to establish standing.).

The Plaintiff States assert that they have standing to challenge the Final Rule based on "compliance costs" and "infringement on state sovereignty." Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Br.") at 8–14, ECF No. 72-1. In support of these arguments, Plaintiffs provide declarations from officials in thirteen of the twenty-one Plaintiff States, mostly from those States' DOTs. *See id.* at 8 n.15; ECF Nos. 72-2 to 72-15.[4] These

_____

[4] The States submitting a declaration are South Dakota, Alabama, Alaska, Florida, Idaho, Indiana, Montana, North Dakota, Ohio, South Carolina, Utah, Virginia, and

declarations generally describe the harms that the state officials believe will result from the Final Rule. Even assuming that these declarations support standing for those states—either on a theory of compliance costs or infringement on state sovereignty—Kentucky has not met its burden of establishing standing because it has not put forward a declaration or any evidence supporting its claimed harms.[5] *See Lujan*, 504 U.S. at 561; *Fair Elections Ohio*, 770 F.3d at 460. Indeed, the Plaintiff States have not submitted any information indicating that the Kentucky Transportation Cabinet (as opposed to the independently elected Kentucky Attorney General, *see* Ky. Const. § 91, who brought this suit) agrees with their assertion that the Final Rule is burdensome or harmful to the state's interests.[6]

---

Wyoming. The remaining Plaintiff States—Kentucky, Arkansas, Iowa, Kansas, Mississippi, Nebraska, Oklahoma, and West Virginia—offer no evidence in support of their standing allegations. Although this brief specifically focuses on Kentucky because Kentucky is the only plaintiff that could provide a basis for proper venue in this Court, each state that has failed to submit a declaration has accordingly not established its standing, and is subject to dismissal from the case as well.

[5] "A defendant can challenge subject-matter jurisdiction in one of two ways: a facial attack or a factual attack." *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 861–62 (6th Cir. 2022). The former "questions merely the sufficiency of the pleading," whereas the latter requires the Court to consider evidence, including "affidavits, documents, and even a limited evidentiary hearing," supporting the factual assertions underlying the jurisdictional claims. *Id.* (citations omitted). The allegations in the Complaint do not specifically address what harms the Final Rule will impose on Kentucky, and thus do not even survive a facial challenge under Rule 12(b)(1). In any event, the Plaintiff States have already moved for summary judgment and submitted declarations from several other states, besides Kentucky. At this stage of litigation, Kentucky must provide evidence to survive a factual attack on standing, *see Lujan*, 504 U.S. at 561; *Fair Elections Ohio*, 770 F.3d at 460, and it has failed to do so.

[6] Plaintiff States cite a July 2021 document, available online, from the Kentucky Transportation Cabinet for the proposition that "economic development is a critical factor" for Kentucky and the Kentucky Transportation Cabinet. Pls.' Br. at 13. The document cited has nothing to do with the Final Rule, GHG emissions, or climate change, nor does it indicate that "economic development" in Kentucky will be hindered by the Final Rule.

"[S]tanding is not dispensed in gross." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)); *cf. id.* ("Rather, plaintiffs 'must demonstrate standing for each claim [they] seek[] to press.'" (alterations in original) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006))). "[I]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)); *see also California v. Texas*, 593 U.S. 659, 672 (2021) ("Remedies . . . ordinarily 'operate with respect to specific parties.' . . . [T]hey do not simply operate ' on legal rules in the abstract.'" (citation omitted)). Kentucky cannot rely on declarations about harms to *other* states; it must establish its own standing in order to obtain relief from the Court. Its failure to do so here requires its dismissal as a plaintiff for lack of jurisdiction.

**B.    Because Kentucky Is Not a Proper Party, this Court Lacks Venue**

If the Court agrees that Kentucky lacks standing and dismisses it as a Plaintiff for lack of subject matter jurisdiction, the Court should then dismiss (or transfer) the remaining claims under Rule 12(b)(3) because the Western District of Kentucky is not a proper venue.

The Complaint cites 28 U.S.C. § 1391(e) as the basis for venue. Compl. ¶ 67. Under that statute,

> [a] civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, . . . or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1).

However, once Kentucky is dismissed, neither 28 U.S.C. § 1391(e) nor any other authority provides a basis for venue in this district: no Defendant resides here, it is not the case that "a substantial part of the events or omissions giving rise to the claim occurred" here, and no (proper) Plaintiff resides here. A plaintiff who lacks Article III standing cannot create venue where it would not otherwise exist. *See Miller v. Albright*, 523 U.S. 420, 426–27 (1998) ("[T]he District Court concluded that Mr. Miller did not have standing and dismissed him as a party. Because venue in Texas was therefore improper, *see* 28 U.S.C. § 1391(e), the court transferred the case to the District Court for the District of Columbia, the site of the Secretary's residence."); *Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) ("Having found that the Institute lacks standing to bring this action and has failed to state a claim upon which relief can be granted, plaintiff cannot manufacture venue by adding the Institute as a party."); *see also* 14D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3815 (4th ed.) ("[V]enue cannot be based on the joinder of a plaintiff" that has been added "for the purpose of creating venue in the district."). The same is true regardless of whether the party to which venue pertains is dismissed on a motion to dismiss or a motion for summary judgment. *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1202–05 (11th Cir. 2018) (transferring case to proper court where only party satisfying venue failed to provide evidence establishing standing).

Accordingly, the Court has two options: either it "[1] shall dismiss, or [2] if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); *see also* Fed. R. Civ. P. 12(b)(3). The district court has discretion as between those options. *See Miles v. WTMX Radio*, 15 F. App'x 213, 215 (6th

Cir. 2001). "[D]istrict courts often dismiss rather than transfer under Section 1406(a) if the plaintiff's attorney reasonably could have foreseen that the forum in which the suit was filed was improper and that similar conduct should be discouraged." 14D Wright & Miller, *supra*, § 3827. Assuming that some Plaintiff States have standing and that any district in which one of those states "resides" would be a proper venue, dismissal would be favored here over transfer in order to allow the parties to decide which of the proper venues is preferred.[7]

## II.     The Final Rule Is an Appropriate Exercise of the Agency's Statutory Authority.

23 U.S.C. § 150(c) authorizes FHWA to issue the Final Rule. Like any other question of statutory interpretation, an analysis of an agency's statutory authority "begins with the statutory text," and, when the text is clear, it "ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 538 U.S. 109, 127 (2018) (citation omitted); *see, e.g., Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020). Here, FHWA's authority to adopt the Rule flows directly from the text of the statute.

In promulgating the Final Rule, FHWA invoked 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V), which provides that FHWA regulations shall establish "measures for States to use to assess" "the performance of the Interstate System" and "the performance of the National Highway System (excluding the Interstate System)." *See* 88 Fed. Reg. at 85,367 (citing these subsections for FHWA's authority and explaining FHWA's interpretation of the statute). Although Congress charged FHWA with establishing performance measures in 23 U.S.C. § 150(c), it did not define the term "performance" as used in that subsection. Thus, FHWA and the Court must interpret this term in the context of the TPM statutory scheme.

---

[7] Alternatively, the Court could transfer the case to the District for the District of Columbia because Defendants reside in that district and the Plaintiff States reside in varied districts.

As FHWA explained, the term "performance" is most logically defined by reference to the seven "national goals" set forth in the immediately preceding subsection. *See* 23 U.S.C. § 150(b). One of those goals is "[e]nvironmental sustainability,"[8] as to which Congress directed the TPM program "[t]o enhance the performance of the transportation system while protecting and enhancing the natural environment." *Id.* § 150(b)(6).[9] Read together, subsections (b)(6) and (c)(3) make clear that Congress intended for "performance" measures to include environmental performance in furtherance of the goal of environmental sustainability. The "[e]nvironmental sustainability" goal, which focuses on the "performance of the transportation system," can only be achieved if FHWA takes reasonable steps to assist State DOTs and MPOs to measure and evaluate factors which affect the "natural environment," *id.* § 150(b)(6), including GHG emissions, on the NHS. Congress's use of the term "performance" in 23 U.S.C. § 150(c)(3) should therefore be read to enable these measures. In this regard, environmental performance,

---

[8] The subheading "[e]nvironmental sustainability" was included in the bill as enacted and should therefore be considered as part of the text of the statute. *Cf. United States v. Wallington*, 889 F.2d 573, 577 (5th Cir. 1989) (considering "heading [that] was included in the statute as it was considered and enacted"); *Cunningham v. Cornell Univ.*, 86 F.4th 961, 976 n.8 (2d Cir. 2023); *United States v. Schopp*, 938 F.3d 1053, 1060 n.3 (9th Cir. 2019).

[9] Plaintiff States argue that the use of the word "while" indicates that "performance of the transportation system" and "protecting and enhancing the natural environment" are two separate and not overlapping objectives. Pls.' Br. at 20–21. But this argument makes little sense in the context of the subheading "[e]nvironmental sustainability." If "performance" is not a part of environmental sustainability, then the phrase "performance of the transportation system" could have been left out of the "[e]nvironmental sustainability" subheading and the goal could have been stated simply as "protecting and enhancing the natural environment." Plaintiff States' argument accordingly must be rejected, for accepting it would give no meaning to Congress's inclusion of "performance of the transportation system" under this subheading.

including $CO_2$ emissions, is a component of the "performance" of the NHS, and as such it is appropriate for FHWA to establish a performance measure for GHG emissions.[10]

Moreover, FHWA's interpretation of "performance" under 23 U.S.C. § 150(c)(3) is consistent with 23 U.S.C. § 119. The purposes of the NHPP, set out in 23 U.S.C. § 119(b), include supporting "the condition and performance of the National Highway System" and supporting "activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." Assessing environmental performance supports both the "condition" of the highway system, as well as activities to increase the system's "resiliency . . . to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." *Id.* Notably, the damaging events Congress listed are all commonly associated with global climate change brought about by rising GHG levels in the atmosphere, *see* 88 Fed. Reg. at 85,368; accordingly, assessment of GHG emissions on the NHS is particularly relevant to this purpose, *id.* Further, Congress connected the TPM scheme and the NHPP statute: 23 U.S.C. § 119(e)(2) directs State DOTs to develop a performance-driven asset management plan that would "support[] the progress toward the achievement of the national goals identified in section 150(b)." And 23 U.S.C. § 119(d)(2) identifies permissible purposes for eligible NHPP projects as including development and implementation of a State DOT's asset management plan under 23 U.S.C. § 119(e). Particularly when read in conjunction with section 119, sections 150(b) and 150(c)(3) make clear that FHWA has authority to establish a performance measure of GHG emissions.

---

[10] FHWA also determined that declining targets in GHG emissions will most effectively help states plan toward reductions in GHG emissions and make infrastructure investment decisions that reduce climate pollution, thereby supporting the performance of the transportation system. *See* 88 Fed. Reg. at 85,369.

As FHWA also acknowledged, *see* 88 Fed. Reg. at 85,368, this reading of the statute is also consistent with other parts of Title 23, which governs the entire highway program. Several other sections of Title 23 of the U.S. Code treat environmental performance as a component of transportation and highway performance. The policy declaration in 23 U.S.C. § 101(b)(3)(G) states that "transportation should play a significant role in promoting economic growth, improving the environment, and sustaining the quality of life." And 23 U.S.C. § 134(a)(1) states as a matter of transportation planning policy that "[i]t is in the national interest . . . to encourage and promote the safe and efficient management, operation, and development of surface transportation systems . . . while minimizing transportation-related fuel consumption and air pollution through metropolitan and statewide transportation planning processes identified in this chapter." Under 23 U.S.C. § 134(h), the scope of the metropolitan planning process is defined to require consideration of projects and strategies that will "protect and enhance the environment, promote energy conservation, improve the quality of life," and "improve the resiliency and reliability of the transportation system." *Id.* § 134(h)(1)(E), (I); *see id.* § 134(c)(1) (requiring MPOs to develop long range plans and transportation improvement programs to achieve the objectives in 23 U.S.C. § 134(a)(1) through a performance-driven, outcome-based approach to planning). The subsequent section similarly defines the scope of the statewide planning process in reference to environmental protection. *See id.* § 135(d)(1)(E), (I). And 23 U.S.C. § 135(d)(2) requires the statewide transportation planning process to "provide for the establishment and use of a performance-based approach to transportation decisionmaking to support the national goals described in" 23 U.S.C. § 150(b), which of course includes "[e]nvironmental sustainability," *id.* § 150(b)(6). These provisions further indicate that assessing highway performance under 23 U.S.C. § 150(c)(3) properly encompasses the assessment of environmental performance, including GHG emissions and other climate-related matters, in furtherance of the goal of environmental sustainability.

17

Plaintiff States argue to the contrary that the Court should adopt the 2018 Rule's interpretation of FHWA's statutory authority. They assert, as does the 2018 Rule, that 23 U.S.C. § 150(c)(2)(C) compels a narrow reading of the word "performance" that disregards the national goals set forth in § 150(b). *See* Pls.' Br. at 20. Section 150(c)(2)(C) provides that FHWA must "limit performance measures only to those described in this subsection," *i.e.*, in 23 U.S.C. § 150(c). In other words, FHWA cannot issue measures for considerations that are not enumerated in 23 U.S.C. § 150(c). But 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) directs that measures be established for the "performance" of the Interstate System and the National Highway System generally. Neither 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) themselves nor 23 U.S.C. § 150(c)(2)(C) imposes any limits or otherwise compels a particular interpretation of the word "performance." Thus, because environmental performance falls within "performance," FHWA may establish a measure for environmental performance, including GHG emissions, without offending 23 U.S.C. § 150(c)(2)(C). In light of the explicit statutory goal of "[e]nvironmental sustainability," the significant risks that climate change-driven extreme weather pose to the condition and performance of the NHS, and FHWA's unquestioned authority to establish performance measures, the Court should interpret the meaning of "performance" of the Interstate System and National Highway System under 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) to include environmental performance in furtherance of the goal of environmental sustainability.

Plaintiff States also advance the 2018 Rule's conclusion that no statutory provision "requires FHWA to adopt a GHG emissions measure." Pls.' Br. at 22. But no provision of law *prohibits* FHWA from adopting a GHG measure either. 88 Fed. Reg. at 85,370. FHWA has authority under 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) to establish measures of "performance" on the NHS. The Final Rule is an appropriate exercise of this authority.

Plaintiff States argue that Congress only permitted FHWA to examine emissions reductions within the limited scope of establishing performance measures for the

Congestion Mitigation and Air Quality ("CMAQ") Program, rather than the NHPP. Pls.' Br. at 21–22 (discussing 23 U.S.C. § 150(c)(5)). However, the provision they rely on only indicates congressional intent that FHWA establish a performance measure for on-road mobile source emissions for the purposes of carrying out the CMAQ Program. Congress did not include any language prohibiting FHWA from establishing other measures related to emissions for the NHPP.

Plaintiff States also argue that subsequent legislative inaction should be deemed to confirm the 2018 Rule's interpretation of the statute. But that legislative history provides little insight into congressional intent in this instance. After FHWA issued PM3 interpretating the TPM statutory scheme to allow FHWA to establish a measure for GHG emissions, and after the 2018 Rule adopted the opposite interpretation, Congress enacted new legislation related to federal highway programs without clarifying FHWA's authorities under 23 U.S.C. § 150(c). *See* Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. No. 117-58, 135 Stat. 429 (2021); *see also* INVEST in America Act, H.R. 3684, 117th Cong., § 1403 (2021) (as introduced in the House). As Plaintiff States note, the House considered language that specifically authorized FHWA to establish a measure for GHG emissions, but this language ultimately was not adopted. *See* Pls.' Br. at 17–18. Plaintiff States suggests that, by declining to amend 23 U.S.C. § 150(c), Congress demonstrated its intent that FHWA not have regulatory authority to establish a GHG measure. *See id.* But the same historical record just as readily supports the inference that Congress determined that FHWA already had authority to establish a GHG measure, and that, accordingly, amending 23 U.S.C. § 150(c) was unnecessary. "Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction, 'including the inference that the existing legislation already incorporated the offered change.'" *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)); 88 Fed. Reg. at 85,376 (citing *id.*). By the time Congress was considering the IIJA, FHWA had already on separate occasions

19

adopted both interpretations of its own authority—once saying it had authority to establish a GHG measure, and once saying it did not—and so Congress's decision not to weigh in after the fact provides little help in interpreting the statute. Indeed, Congress's refusal to step in is, if anything, an indication that Congress's intention was to afford the agency authority to make reasonable policy judgments about how best to implement the statute, even if such policy judgments have historically been in flux.

Plaintiff States additionally argue that the Final Rule's interpretation of FHWA's authority violates the "major questions doctrine." Pls.' Br. at 15–19. Under the "major questions doctrine," courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *W. Virginia v. EPA*, 597 U.S. 697, 716 (2022) (citation omitted). A regulation that "order[s] the wholesale restructuring of an[ entire] industrial sector" and has "billions of dollars of impact," for example, might trigger the major questions doctrine because of the regulation's vast economic significance. *Id.* (citation omitted). So, too, might a situation in which an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'" *Id.* at 724 (second alteration in original) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). In "certain extraordinary cases," a court might require the agency to "point to 'clear congressional authorization' for the power it claims" in the challenged action. *Id.* at 723 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

But the Final Rule simply is not one such "extraordinary case" to which the major questions doctrine might apply. The Final Rule does not have vast economic or political impacts. *See* 88 Fed. Reg. at 85,375. The Final Rule merely adds one additional target and reporting requirement for State DOTs and MPOs to an existing regulatory scheme using existing data sources. And although states are required to set declining targets for $CO_2$ emissions, the Rule does not dictate a rate of decline, and imposes no penalty for failure to meet the targets. *Id.* at 85,378. *Contra* Pls.' Br. at 15 (incorrectly asserting that the Final

Rule "mandates every State, the District of Columbia, and Puerto Rico to reduce on-road $CO_2$ emissions"). Nor does the Final Rule require states to change their approach to selecting projects or indeed to do anything other than monitor emissions, set targets, and submit reports. *See* 88 Fed. Reg. at 85,375 ("Th[e Final Rule] does not require State DOTs and MPOs to change their approach to selecting projects."). *Contra* Pls.' Br. at 16 (incorrectly asserting that the Final Rule "effectively requires States to select projects that will achieve a 'declining target' for $CO_2$ emissions"). Rather, the purpose of the Final Rule is to provide state and local decisionmakers with consistent and transparent information to inform their decisionmaking without mandating any specific approach or results. *See* 88 Fed. Reg. at 85,375. And the agency reasonably estimated the total cost of implementing the Final Rule to be around $12.7 million over ten years total across all states and MPOs, *see id.* at 85,389, a far cry from the sort of vast economic impact present in cases in which courts have found the major questions doctrine applies.

Moreover, the Final Rule does not involve a novel interpretation of a longstanding statute. The MAP-21 and FAST Act were enacted in 2012 and 2015, respectively. The first three regulations promulgated under the TPM framework were published between 2016 and 2017, with PM3 adopting the original interpretation of the statute that FHWA now claims. FHWA did not "discover in a long-extant statute an unheralded power," *Util. Air Regul. Grp.*, 573 U.S. at 324, and thus, that basis for invoking the major questions doctrine is lacking as well.

In any event, Congress *did* speak clearly in authorizing FHWA to establish measures related to environmental performance. Under 23 U.S.C. § 150(c)(3), FHWA has authority to establish measures for the "performance" of the NHS, in furtherance of the "goals" of the statute set forth in 23 U.S.C. § 150(b), which include "[e]nvironmental sustainability." Thus, even if this were an "extraordinary case," the straightforward reading of 23 U.S.C. § 150 to authorize FHWA to establish measures related to

21

environmental performance would provide the requisite "clear congressional authorization." *W. Virginia*, 597 U.S. at 723 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

Finally, Plaintiff States say the Final Rule "violates principles of federalism" by mandating "declining emissions targets." Pls.' Br. at 24. Plaintiff States acknowledge that the statute requires states to set targets with respect to the measures established by FHWA. *Id.* (discussing 23 U.S.C. § 150(d)). But the Final Rule's requirement that states set declining targets, they say, "significantly alter[s] the balance between federal and state power," and thus Congress needed to "use 'exceedingly clear language'" to grant this authority to FHWA. *Id.* (quoting *Kentucky v. Biden*, 23 F.4th 585, 609 (6th Cir. 2022)); *see also* 88 Fed. Reg. at 85,369 (explaining why the Final Rule requires declining targets for GHG emissions).

The "federalism canon" does not apply here. The statute is clear that FHWA has authority to establish measures and that states must set targets that reflect those measures. *See* 23 U.S.C. § 150(c), (d). Further, the obligation to set targets required by federal law (and a federal law of relatively recent vintage, at that) is not the sort of "power" traditionally enjoyed by states that gives rise to federalism concerns. *See Kentucky*, 23 F.4th at 609 (collecting cases discussing traditional state police powers). Administrative action limiting the manner in which states can comply with that obligation therefore does not "significantly alter the balance between federal and state power." *Id.*[11] In any event, the Final Rule contains a severability clause, *see* 88 Fed. Reg. at 85,373, so even if the Court agrees that the requirement for declining targets exceeds

---

[11] Importantly, nothing in the Final Rule changes the relationship between the states and the FHWA related to selecting projects. As described in the Final Rule, under 23 U.S.C. § 145, states determine which of their projects shall be federally financed by Federal-aid highway formula dollars. Under the Final Rule, states set and determine targets based on appropriate data as informed by their policies and priorities. The FHWA is not prescribing what declining targets would look like in each state, and FHWA is not requiring states to achieve targeted emission reductions, nor prescribing the selection of specific projects. *See* 88 Fed. Reg. at 85,369.

FHWA's statutory authority, relief should be limited to that specific requirement, and the remainder of the Final Rule should be upheld.

### III.    The Final Rule Is Not Arbitrary and Capricious.

Plaintiff States' arbitrary-and-capricious claims fare no better. Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of Poor Saints Peter & Paul Home*, 140 S. Ct. at 2383 (citation omitted). A court's review is "narrow" and it "is not to substitute its judgment for that of the agency." *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Ky. Coal Ass'n v. Tenn. Valley Auth.*, 804 F.3d 799, 801 (6th Cir. 2015) (APA standard "is not an invitation for judicial second-guessing"). Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Plaintiff States argues that (1) the Final Rule is impermissible under the law, (2) FHWA failed to provide a reasoned explanation for the Final Rule, and (3) FHWA failed to consider certain costs to the states. Pls.' Br. at 26–35. Each argument is meritless.

### A.  The Final Rule Is Permissible Under the Law

The Plaintiff States' first argument—that the Final Rule "is arbitrary and capricious because it is not permissible under the enabling legislation," *id.* at 26–27, duplicates their statutory-authority argument. Plaintiff States repeat their arguments that FHWA lacks authority under 23 U.S.C. § 150(c) to establish a GHG measure and that FHWA cannot mandate declining targets under 23 U.S.C. § 150(d). *Id.* at 27. As explained above, *supra* Part I, Congress has granted FHWA statutory authority to establish a measure for GHG

emissions on the NHS and to require declining targets. Thus, of course FHWA can consider these factors when issuing such a rule. *Contra* Pls.' Br. at 27.

### B. FHWA Provided a Reasoned Explanation for the Final Rule

Second, Plaintiffs States argue that the Final Rule is arbitrary and capricious because FHWA failed to articulate a satisfactory explanation for the rule. *Id.* But FHWA provided an explanation for issuing the Final Rule, as the APA requires, and so Plaintiff States' arguments fail.

Plaintiff States first argue that the agency did not adequately explain its departure from the 2018 Rule. *See id.* at 28. "[A]n agency is certainly entitled to change course." *Am. Petrol. Inst. v. EPA*, 906 F.2d 729, 738 n.11 (D.C. Cir. 1990). "[A]gencies are expected to reevaluate the wisdom of their policies in response to changing factual circumstances." *COMPTEL v. FCC*, 978 F.3d 1325, 1335 (D.C. Cir. 2020). There is no heightened standard when an agency changes its policy so long as the agency "display[s] awareness that it *is* changing position," and shows that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Final Rule explains FHWA's reconsideration of the rationales underlying the 2018 Rule and determination to depart from them. 88 Fed. Reg. at 85,369–70. The Final Rule explains that the 2018 Rule adopted a mistakenly narrow interpretation of 23 U.S.C. § 150(c) that overlooked the subsection recognizing environmental sustainability as a national goal of the TPM. *Id.* It also explains that the 2018 Rule misunderstood and thus overestimated the cost of a GHG measure to states and MPOs, *id.* at 85,370, and that other programs that collect data on $CO_2$ emissions do not provide the specific information gained from the Final Rule, *i.e.*, emissions from on-road mobile sources on the NHS, *see id.* at 85,379. Nothing more is required under the APA, and Plaintiff States' disagreement with FHWA's determination is not a basis for finding the Final Rule arbitrary and capricious. *See Inv. Co. Inst. v. Commodity Futures Trading Comm'n*,

720 F.3d 370, 380 (D.C. Cir. 2013) (rejecting argument that "amounts to nothing more than [a] policy disagreement"); *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 488–89 (6th Cir. 2014) (similar).

Plaintiff States then suggest that the Final Rule is motivated by presidential policy. Pls.' Br. at 28–29. Even assuming the Plaintiff States are correct that the President's executive orders informed FHWA's policy judgments in promulgating the Final Rule, there is nothing unusual or unlawful about that. "[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019). And unlike in *Department of Commerce v. New York*, here there is no "significant mismatch between the decision the [agency] made and the rationale [it] provided." *Id.* at 2575. To the contrary, the rationale provided in the Final Rule amply justifies the decision made, and the Plaintiff States do not contend otherwise.[12]

Next, Plaintiff States say that the Final Rule's justification—that it is an effort to mitigate GHG emissions and to combat climate change—is unsupported by the scientific studies, cited in the Final Rule, that discuss the harms of climate change generally and not specifically the role of on-road $CO_2$ emissions. Pls.' Br. at 29. This argument ignores the fact that the Final Rule explains that on-road emissions sources are a substantial

---

[12] Moreover, the Final Rule in fact specifically does not require states to adhere to emissions benchmarks set out in the executive orders. "Upon considering public comments," the Final Rule states, "FHWA recognizes that the reference to net-zero targets and national GHG goals in the NPRM may have caused confusion, and FHWA has removed the definition of net-zero from 23 CFR 490.101 and the requirement in 23 CFR 490.105(e)(10) that targets for the GHG measure 'demonstrate reductions toward net-zero targets.'" 88 Fed. Reg. at 85,380. "Declining targets are not required to align with the Administration's goal for the U.S. to reduce $CO_2$ emissions 50–52 percent below 2005 levels by 2030 and achieve net-zero emissions economywide by 2050, in accordance with national policy established" by the executive orders. *Id.* "Rather, FHWA believes these national goals can provide a useful roadmap for State DOTs and MPOs as they consider how their targets fit into a longer timeframe of emission reductions." *Id.*

contributor to overall GHG emissions. *See* 88 Fed. Reg. at 85,366. The establishment of a measure for on-road GHG emissions is thus connected to the overall justification of mitigating the effects of climate change.[13]

Plaintiff States then assert that some scientific studies indicate that GHG emissions do not contribute to climate change in a significant way or that the models FHWA relied on are inaccurate. Pls.' Br. at 29–31. FHWA reasonably determined that the scientific studies supporting its assessment of the risks of climate change and GHG emissions' contribution thereto were more reliable than the contradictory studies favored by the Plaintiff States, and the agency explicitly addressed the comments that the Plaintiff States say the agency ignored. *See* 88 Fed. Reg. at 85,388 (discussing the "social cost of carbon"); IPCC, 2021: *Summary for Policymakers*, at 4, Admin. R. FHWA001032 (describing GHG impacts on climate change). Courts must be at their "most deferential" when reviewing an agency's "scientific determination." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *Citizens Coal Council v. EPA*, 447 F.3d 879, 890 (6th Cir. 2006) ("Where the rulemaking involves review of the agency's technical or scientific evaluations and determinations, the highest level of deference to the agency is to be applied."). Here, FHWA "made a reasonable predictive judgment based on the evidence it had" regarding on-road sources of GHG emissions and their effects on climate change, which is all the APA requires. *Prometheus Radio Project*, 592 U.S. at 427; *see also San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) ("[Even] if the only available data is 'weak, and thus not dispositive,' an agency's reliance on such data 'does

---

[13] Along with scientific support for this position, FHWA also identifies Congress's express focus on using transportation programs to reduce GHG emissions from transportation sources through new programs and eligibilities in the IIJA, such as the Carbon Reduction Program and new language regarding national electric vehicle charging and hydrogen, propane, and natural gas fueling corridors to support changes in the transportation sector that help achieve a reduction in GHG emissions. *See id.* at 85,368. FHWA's reasoned decision to help states spend these new transportation dollars is not only supported by science, but also by statute.

not render the agency's determination arbitrary and capricious.'" (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992))).[14]

Finally, the Plaintiff States say that the Final Rule lacks justification because it does not impose penalties on states for failing to achieve their targets, Pls.' Br. at 31–32, stating that if "the States do not have to comply, then the rulemaking seems facially unnecessary and unwarranted." *Id.* at 32. The goal of the Final Rule is "to help State DOTs and MPOs consistently and transparently monitor the current performance of the NHS, and plan transportation projects in a way that protects the long-term performance of the NHS." 88 Fed. Reg. at 85,367. "The rule provides State DOTs and MPOs with the tools to consider GHG emissions in making transportation decisions and imposes no penalties on States and MPOs that do not meet their targets . . . ." *Id.* at 85,380. The Rule is clear: states must comply with the Final Rule by setting targets and submitting reports, but achievement of the targets is not required for compliance. Nothing about this type of data-monitoring rule violates the APA.

### C. FHWA Considered the Costs to States

Third, Plaintiff States argue that FHWA acted arbitrarily and capriciously by not considering the full costs to states of implementing the Final Rule. The Final Rule considered the costs of setting targets, reporting on targets, reporting on actions by the States that do not meet their targets, and preparing and calculating the GHG performance metric. *See* Admin. R. at FHWA000061. The Final Rule estimated these costs to total $12.7 million. 88 Fed. Reg. at 85,389. But Plaintiff States complain that FHWA failed to "consider the costs for action necessary to achieve any declining target." Pls.' Br. at 33. In fact, the Final Rule addresses precisely this point: "The rule does not impose compliance costs associated with achieving declining targets since the rule does not require that

---

[14] In a footnote, Plaintiffs also say FHWA failed to address certain comments regarding the efficiency of electric vehicles. Pls.' Br. at 31 n.31. FHWA addressed these comments. *See* 88 Fed. Reg. at 85,377.

emissions actually decrease or establish any penalties in the event that declining targets are not achieved." 88 Fed. Reg. at 85,379.[15] Plaintiff States dedicate the remainder of their argument to explaining the costs they believe to be associated with "[a]chieving any declining GHG performance target." Pls.' Br. at 33. But the Final Rule imposes no penalties for failing to achieve targets or for failing to take the actions expressed in a previous report. Because the Rule imposes no requirement on states to actually take the actions they say they will take, the Rule carries no associated costs beyond the cost of submitting the reports.[16]

In any event, during the rulemaking, FHWA considered comments submitted regarding alleged costs and expressly and reasonably addressed these comments in the Final Rule. *See* 88 Fed. Reg. at 85,379. Nothing more is required under the APA. *See Prometheus Radio Project*, 592 U.S. at 423 (stating that the agency only needs to have "reasonably considered the relevant issues and reasonably explained the decision"). That Plaintiff States disagree with FHWA's assessment does not render the Final Rule arbitrary and capricious. "[M]ere policy disagreement is not a basis for a reviewing court to declare agency action unlawful." *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007). And for similar reasons, the Court should reject the Plaintiff States' argument that the alleged "costs come with only uncertain benefits to balance them." Pls.' Br. at 34. Courts are not to "second-guess[]" an agency's "weighing of risks and benefits" associated with a rulemaking. *Dep't of Com.*, 139 S. Ct. at 2571.

---

[15] The Final Rule also notes that the cost of achieving declining emissions targets—which is *not* required under the Final Rule—would not actually be burdensome for transportation agencies because IIJA provides over $27 billion in federal funding to help State DOTs and MPOs achieve declining GHG targets. 88 Fed. Reg. at 85,377.

[16] Plaintiff States also briefly note that there is a cost associated with the requirement that State DOTs that do not make significant progress toward achieving their targets must "document the actions [they] will take to achieve the GHG performance target." Pls.' Br. at 33. FHWA considered these specific costs. *See* Admin. R. at FHWA000061 (calculating the states' costs to "Develop and Report Plan to Achieve GHG Targets").

**IV.  The Final Rule Does Not Violate the Spending Clause.**

The Court should reject Plaintiff States' claim that the Final Rule violates the Spending Clause by attaching conditions on federal funding that are not clearly set out by Congress. States do not risk NHPP funding—or, indeed, face any consequences—for failing to meet the GHG targets they establish. The Final Rule is thus not a condition on funding at all, and the Spending Clause is not implicated.

"Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The Supreme Court's *Pennhurst* decision and its recent progeny reflect the basic proposition that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Just as with actual contractual obligations, a state must "voluntarily and knowingly accept[] the terms" attached to federal funding for those terms to be enforceable. *Id.* For that reason, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* Congress cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Id.* at 25; *see also Nat'l Fed'n of Indep. Business v. Sebelius* (*NFIB*), 567 U.S. 519, 584 (2012).

Courts have applied the *Pennhurst* rule to relieve states of the obligation to comply with statutory conditions on federal funding that were not sufficiently apparent at the time the states accepted that funding. In *Pennhurst* itself, for example, the question was whether the "bill of rights" provision of a federal statute stated an enforceable condition at all, or whether it was merely "hortatory." 451 U.S. at 15–27. Construing the statute, the Court found it "clear that the provision[]" was "intended to be hortatory, not mandatory," *id.* at 24, and thus foreclosed any effort to enforce the provision against the state entity.

Here, the Final Rule expressly states that "[t]he FHWA is neither requiring any specific targets *nor mandating any penalties for failing to achieve these targets*." 88 Fed. Reg. at 85,367 (emphasis added); *see also id.* at 85,378 ("There are no specific penalties for failing to achieve GHG targets."). The goal of the Final Rule is "to help State DOTs and MPOs consistently and transparently monitor the current performance of the NHS, and plan transportation projects in a way that protects the long-term performance of the NHS." *Id.* at 85,367. "The rule provides State DOTs and MPOs with the tools to consider GHG emissions in making transportation decisions *and imposes no penalties on States and MPOs that do not meet their targets* . . . ." *Id.* at 85,380 (emphasis added). The Final Rule only requires that states submit periodic reports that set targets for GHG emissions and measure the progress made towards those targets. A state's NHPP funding is not at risk for failure to meet its GHG targets, so there is no "condition" on funding to analyze for statutory clarity.

To the extent that Plaintiff States argue that the requirements for states to set targets and submit reports are themselves unconstitutional conditions on funding, these arguments are misplaced as well. Plaintiff States have not provided evidence that their funding is at risk over failure to set targets or submit reports. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that in order for plaintiffs to have standing, the "threatened injury must be *certainly impending*" and not merely "*possible*" (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))). By regulation, the FHWA may "take such . . . action that he deems appropriate under the circumstances" when a state fails to comply with FHWA regulations, including that possibly "withhold[ing of] payment to the State of Federal funds." 23 C.F.R. § 1.36. But Plaintiffs provide no evidence that such withholding of funds has been common for past noncompliance with the TPM, nor any reason why such action is likely or certainly impending for noncompliance with the Final Rule. In any event, the statute is clear that FHWA has authority to establish measures and that states must set targets that reflect

those measures and submit reports to FHWA. *See* 23 U.S.C. § 150(c)–(e). The Final Rule therefore does not violate the Spending Clause.

## V.   Any Relief Should Be Limited to the Plaintiff States that Are Proper Parties.

In the event that the Court finds that Plaintiff States is entitled to relief,[17] such relief should be limited to the Plaintiff States that have demonstrated an injury-in-fact for standing purposes. Relief should be no broader than necessary to remedy any harm demonstrated by plaintiffs in a given case. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). "[N]ationwide injunctions or universal remedies . . . seem to take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act or refrain from acting toward nonparties in the case. . . . Nationwide injunctions sometimes give States victories they did not earn . . . ." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump v. Hawaii*, 585 U.S. 667, 720 (2018) (Thomas, J., concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power"); *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (staying nationwide injunction of COVID-19 vaccination mandates as "an issue of great significance" that "will benefit from the airing of competing views in our sister circuits." (citation omitted)). As Justices Gorsuch, joined by Justice Thomas, has explained, "[b]ecause plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This creates risks of "conflicting nationwide

---

[17] For the reasons explained above, none of Plaintiff States' claims has merit. However, in the event that the Court disagrees, it should confine its ruling to a non-constitutional basis, if possible. "Under the doctrine of constitutional avoidance, we avoid constitutional determinations when a case can be resolved on other grounds." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 726 F.3d 767, 771 (6th Cir. 2013).

injunctions," with "asymmetric" stakes where "a single successful challenge is enough to stay the challenged rule across the country." *Id.*; *see also Trump*, 585 U.S. at 713 (Thomas, J., concurring) (Universal relief "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.").

This case presents the sort of circumstances that especially militate against nationwide relief. The State of Texas has separately challenged the Final Rule in the Northern District of Texas. *See Texas v. U.S. Dep't of Transp.*, No. 5:23-cv-00304-H (N.D. Tex.). Granting relief beyond the Plaintiff States risks conflicting rulings within certain jurisdictions and condoning the "gamesmanship and chaos" Justices Gorsuch and Thomas warned against. *Dep't of Homeland Sec.*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This Court should "avoid rulings which may trench upon the authority of sister courts." *Delta T Corp. v. Ritchie Eng'g Co.*, No. 5:11-cv-208, 2011 WL 13234316, at *1 (E.D. Ky. Nov. 18, 2011) (quoting *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24, S. Atl. & Gulf Coast Dist. of the ILA, AFL-CIO*, 751 F.2d 721, 729 (5th Cir. 1985)).

Nor does the fact that Plaintiff States bring an APA claim compel a nationwide remedy. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582–84 (9th Cir. 2018) (vacating nationwide scope of injunction in facial challenge under the APA). A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and the APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), is insufficient to mandate such a departure. The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967). Significantly, no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter. *See Trump*, 585 U.S. at 716 (Thomas, J.,

32

concurring). Accordingly, the Court should construe the "set aside" language in section 706(2) as applying only to plaintiffs that are before the Court. Finally, at least three Supreme Court Justices have recently indicated their understanding that the APA does not require, or perhaps even permit, universal vacatur of agency actions. *See United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment) (joined by Justices Thomas and Barrett). This Court should follow Justice Gorsuch's *Texas* concurrence and decline to enter a nationwide order of vacatur.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss, or, in the alternative, cross-motion for summary judgment and deny Plaintiff States' Motion for Summary Judgment. In the event the Court grants Plaintiff States' motion for summary judgment, any relief should limited to the Plaintiff States that are proper parties to this case.

DATED: February 23, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Branch Director

/s/ Michael P. Clendenen
MICHAEL P. CLENDENEN
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone:  (202) 305-0693
E-mail:  michael.p.clendenen@usdoj.gov

*Counsel for Defendants*

**<u>Certificate of Service</u>**

I certify that on February 23, 2024, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which automatically provides notice of filing to all parties.

*/s/ Michael P. Clendenen*
MICHAEL P. CLENDENEN
Trial Attorney
Civil Division, Federal Programs Branch
